## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

| | | |
|---|---|---|
| **TECHNOLOGY FOR ENERGY** | ) | |
| **CORPORATION** | ) | |
| | ) | |
| **Plaintiff.** | ) | |
| | ) | |
| **v.** | ) | **Case No. _____** |
| | ) | |
| **WILLIAM H. HARDY AND** | ) | |
| **POWER MEASUREMENTS, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

### COMPLAINT

---

Comes the Plaintiff, Technology for Energy Corporation ("TEC"), by and through counsel, and for cause of action against the Defendants, William H. Hardy ("Hardy") and Power Measurements, LLC ("Power Measurements") (Hardy and Power Measurements are collectively referred to as "Defendants"), states as follows:

### I.     BACKGROUND INFORMATION

1.     TEC is a Tennessee corporation and its principal place of business is located at 10737 Lexington Drive, Knoxville, Tennessee 37932.

2.     Hardy is a citizen of Gainesville, Virginia and resides at 6386 Avington Place, Gainesville, Virginia 20155.  This Defendant may be served with process at the foregoing address.

3.     Power Measurements is a Virginia limited liability company.  Its principal place of business is located at 6386 Avington Place, Gainesville, Virginia 20155.  Its registered agent

1

for service of process is Incorp Services, Inc., which is located at 7288 Hanover Green Drive, Mechanicsville, Virginia 23111.

## II.    JURISDICTION AND VENUE

4.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because this action is between citizens of different states and involves an amount in controversy exceeding $75,000.00, exclusive of interest and costs.  This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) in that it arises under the United States Patent Laws.  This Court also has subject matter jurisdiction under 28 U.S.C. §§ 2201 and 2202.

5.     This Court has personal jurisdiction over Hardy and Power Measurements because Hardy and Power Measurements caused tortious injury in Tennessee by acts outside Tennessee with the purpose and reasonable expectation of injuring TEC in Tennessee.  Hardy misappropriated trade secrets from TEC while he was still employed by TEC in Tennessee and used that information he wrongly took to found his competitor firm, Power Measurements.   In committing these acts outside Tennessee, Hardy and Power Measurements necessarily would have had the purpose and reasonable expectation of enhancing their own business at the expense of TEC in Tennessee.  Hardy purposefully availed himself of the privilege of employment in Tennessee and he misappropriated trade secrets while he was in Tennessee.  Hardy caused a consequence in Tennessee by his subsequent actions in Virginia and the Philippines—founding Power Measurements—with the aid of confidential information he took from TEC.

6.     Jurisdiction and venue are proper in this Court by virtue of the fact that Hardy worked for TEC in Knox County, Tennessee from December 8, 2003 until April 16, 2012. Effective May 24, 2012, Hardy and TEC entered into a Severance and Release Agreement ("Severance Agreement") that included the following provision:

2

> This Agreement shall be governed by the laws of the State of Tennessee, without regarding for any conflict of law principles, and any legal proceeding arising out of or in connection with this Agreement shall be brought in a court with subject matter jurisdiction located in Knox County, Tennessee.  Each party irrevocably and unconditionally consents to the service of any process, pleadings, notices or other papers in connection with any such proceeding and to submit to personal jurisdiction in such venue.

A copy of the Severance Agreement is attached hereto as **Exhibit 1**.

## III.   FACTS

7.   TEC designs and manufactures diagnostic instruments for customers working in the aviation, materials testing, nuclear power, and electric power industries.

8.   Powermetrix is a division of TEC focused on providing the most innovative and accurate testing solutions to the worldwide power and energy market. Powermetrix engineers, designs, and manufactures electric power measurement instruments for the power industry.

9.   TEC has expended considerable, money, resources, and time in developing the Powermetrix division and the products associated therewith, and in establishing relationships with its customer base in this field.

10.   Hardy was employed by TEC since December 8, 2003, and was Vice President over TEC's Powermetrix division from April 29, 2011 until his separation on April 16, 2012.

11.   Prior to his employment with TEC, Hardy was a physicist and had minimal experience in the field of power and energy testing.  TEC spent considerable money, resources, and time in training Hardy for him to perform in this industry.

12.   TEC took reasonable measures to protect the confidentiality of its proprietary information, formulas, and technology.  TEC's employees are required to sign an Employment Agreement, which, among other things, prohibits the disclosure of TEC's confidential and

3

proprietary information and provides that all such information is the property of TEC and must be returned to TEC upon termination of the agreement. A copy of the Employment Agreement is attached hereto as **Exhibit 2**. Other measures taken by TEC include password-protected security, keeping confidential information on the company's secure server, and strictly limiting such access to a limited number of authorized personnel on a need-to-know basis.

13.     TEC also maintains and protects its trade secrets, confidential and proprietary information by means which include, for example: (i) requiring user IDs and passwords to access TEC's computer system; (ii) locking up confidential documents or shredding confidential documents upon disposal; (iii) requiring key access to TEC's facilities; and (iv) limiting visitors' access to TEC's offices and confidential and proprietary information.

14.     Hardy, through his position as the Powermetrix Vice President, had extensive access to TEC's trade secrets, confidential and proprietary information, technology, formulas, and equations.

15.     At the inception of his employment, Hardy signed an Employment Agreement dated December 8, 2003, which provides in material part, as follows:

> 1. a)  I agree that I will promptly communicate to TEC all inventions, discoveries, and improvements made or conceived or reduced to practice by me, solely or jointly with others during the term of employment.
>
> b)  I hereby assign to TEC or its nominees all my rights to such inventions, discoveries and improvements that are within the scope of actual or anticipated business, products, services or projects of TEC as defined and limited by the TEC Charter.
>
> *     *     *
>
> d)  I will execute all papers and help in any reasonable way to maintain the rights of TEC in these matters.
>
> *     *     *

4

2. b) I further agree that I will not without written authorization from TEC, make any copies of such writings, or use or allow others to use such writings, or copies, except as reasonably required or advantageous for the performance of my work at TEC.

\* \* \*

3. a)  I will not, during my employment by TEC or thereafter without TEC's written approval, disclose to others nor use for my own benefit or the future benefit of any other individual or firm, data and information which is not generally known, which relates to my work or which relates to the actual or anticipated business, products, services or projects of TEC or similar data and information of other individuals or organizations to which I may gain access in the course of my employment by reason of such employment.

\* \* \*

4.  I agree that, except as may be noted on the attached External Activity Disclosure Form, there are no inventions or information which I deem to be excluded from the scope of the agreement.

**(Ex. 2.)**

16.    The Severance Agreement, which Hardy signed following his termination, included the following provisions:

12.  Non-Compete, Non-Solicitation.  Non-Disparagement and Confidentiality Covenants.

(a) Hardy's Reaffirmation of Terms of Employee Agreement and Buy and Sell Agreement. Hardy acknowledges that the terms of the Employee Agreement require that he shall not, without TEC's prior written approval, "disclose to others nor use for his own benefit or the future benefit of any other individual or firm, data and information which is not generally known, which relates to his work or which relates to the actual or anticipated business, products, services or projects of TEC or similar data and information of other individuals or organization to which he has gained access in the course of his employment with TEC." Hardy also acknowledges that the terms of the 2007 and 2011 Stock Option Award Agreements require that for a period of five years after the Termination Date, Hardy shall "not compete directly or

5

indirectly with the products or services" which were offered by TEC during the term of his employment, and that he is prohibited from using at any time for any reason any "proprietary and confidential information" of TEC to which he had access during his employment by TEC. Hardy hereby acknowledges and reaffirms such obligations.

(b) <u>Covenant Not to Compete</u>. As additional consideration for the benefits to be paid to Hardy by TEC under this Agreement, Hardy agrees, in addition to his obligations referenced in <u>Section 12(a)</u> above, that he will not, without the prior, written consent of TEC: (1) induce or attempt to induce any customer of or supplier to TEC to cease or reduce its business or other relationship with TEC or any of its Affiliates, or otherwise interfere with the relationship between TEC or any of its Affiliates and any such person, entity or organization; (ii) engage, directly or indirectly, in any activity with any current customer of TEC anywhere in the world that is competitive with the business of TEC; or (iii) engage, directly or indirectly, in any activity anywhere in the world that is competitive with the business of TEC. For purposes of this Agreement, "engage" shall mean having any direct or indirect interest in any person, entity or organization, whether as an owner, stockholder, partner, member, joint venturer, creditor, director, officer, employee, consultant, independent contractor or otherwise, or rendering any direct or indirect service or assistance to any person, entity or organization (whether as an agent, consultant, or otherwise). Provided, however, the mere, passive ownership by Hardy of 10% or less of a publically traded corporation shall not, in itself, constitute a violation of the provisions of this Section 12(b). The provisions of this <u>Section 12(b)</u> shall remain in effect for a period of five years after the Termination Date.

(c) <u>Covenant of Non-Solicitation</u>. As additional consideration for the benefits to be paid to Hardy by TEC under this Agreement, Hardy agrees, in addition to his obligations referenced in <u>Sections 12(a) and 12(b)</u> above, that he shall not directly or indirectly: (i) take any action to solicit or divert any business (or potential business) or clients or customers (or potential clients or potential customers) away from TEC; (ii) induce customers, potential customers, clients, potential clients, suppliers, agents or other persons under contract or otherwise associated or doing business with TEC, to reduce or alter any such association or business with or from TEC; or (iii) induce any person in the employment of TEC or any consultant to TEC to (A) terminate such employment or consulting arrangement, (B) accept employment or enter into any consulting arrangement with anyone other than TEC, or (C)

6

interfere with the customers, suppliers, or the clients of TEC in any manner or the business of TEC in any manner. For purposes of this Agreement, a "potential client" or a "potential customer" shall mean a person or entity that TEC: (i) is or will be in the reasonably foreseeable future soliciting or considering soliciting (or has targeted for solicitation, or will be so targeting in the reasonably foreseeable future); or (ii) has, at any time or from time to time been soliciting for or in respect of any current, actively pending or contemplated product lines, businesses or services offered by TEC. Also for purposes of this Agreement, "potential business" shall mean any current or reasonably foreseeable commercial activity or any current or reasonably foreseeable commercial opportunities associated in any way with TEC. The provisions of this Section 12(c) shall remain in effect for a period of five years after the Termination Date.

(d) <u>Covenant of Non-Disparagement</u>. Hardy agrees that he shall make no negative statements or communications disparaging TEC or its officers, directors, shareholders, agents, businesses, products, or services to any third party.

(e) <u>Injunctive Relief</u>. Hardy acknowledges and agrees that the provisions of this Section 12 form an integral and material portion of the consideration given by Hardy in exchange for TEC's execution of this Agreement, and that the provisions of this Section 12 are reasonable in nature and scope in every respect. Hardy acknowledges that a violation of this Section 12 would cause immediate and irreparable harm to TEC, and that damages for such harm would be difficult to calculate. As a result, Hardy agrees that TEC may seek an injunction, temporary, permanent or otherwise, restraining order or such other equitable relief as may be available to prevent or restrain Hardy's breach of this Section 12, without the necessity of showing actual damages or posting a bond or other security.

**(Ex. 1.)**

17.     The Severance Agreement also provides:

(e) <u>Confidentiality</u>.  In order for Hardy to perform the Consulting Services, Hardy will remain exposed to TEC's Confidential Information (as defined below), and Hardy agrees to use such information only in the best interests of TEC. Hardy further agrees that he shall not, without the prior written authorization of TEC, directly or indirectly use, divulge, furnish or make accessible to any company, person or other entity any Confidential Information (as defined below), but instead shall keep all Confidential

7

Information strictly and absolutely confidential. Further, Hardy will take all actions reasonably required of him to prevent his employees, agents and representatives, as the case may be, from using or divulging such information in a manner or for a purpose that may be contrary to the best interests of TEC.

(f) <u>Definition of Confidential Information</u>.  For purposes of this Agreement, the term "Confidential Information" shall include, but not by way of limitation, trade secrets concerning the business of TEC, product specifications, know-how, processes, records, customer and supplier lists and the location of any such customers or suppliers, current and anticipated customer requirements, price lists, market studies, business plans, any information, however documented, that is a trade secret under applicable law, and all other information associated with the products and services of TEC. The term "Confidential Information" does not include information which: (i) becomes generally available to the public other than as a result of a disclosure by Hardy; (ii) is received from a third party who did not acquire or disclose such information by a wrongful act; (iii) is or has been independently developed by Hardy without reference to any Confidential Information; (iv) is disclosed pursuant to applicable law or the order or requirement of court, administrative agency or other governmental body, provided, however, that Hardy shall provide prompt notice of such court order or requirement to TEC to enable TEC to seek a protective order or otherwise prevent or restrict such disclosure and Hardy's right to disclose such Confidential Information shall be strictly limited to the extent necessary to comply with such law, order or requirement; or (v) is disclosed with the prior written approval of TEC.

(g) <u>Property of TEC</u>. Hardy agrees that all plans, manuals and all other specific materials developed by Hardy on behalf of TEC and prior thereto on behalf of TEC in connection with services rendered under this Agreement and prior thereto as an employee of TEC are and shall remain the exclusive property of TEC. Promptly upon the expiration or termination of the Consulting Period, or upon the request of TEC, Hardy shall return to TEC all documents and tangible items, including samples, provided to Hardy or created by Hardy for use in connection with services to be rendered hereunder, including without limitation all Confidential Information, together with all copies and abstracts thereof.

*   *   *

8

(i) <u>Outside Services</u>.  Hardy shall not use the service of any other person, entity or organization in the performance of Hardy's duties without the prior written consent of TEC.  Should TEC consent to the use by Hardy of the services of any other person, entity or organization, no information regarding the services to be performed under this Agreement shall be disclosed to that person, entity or organization until such person, entity or organization has executed an agreement to protect the confidentiality of TEC's Confidential Information and TEC's absolute and complete ownership of all right, title and interest in the work performed under this Agreement in connection with the Consulting Services.

(j) <u>Conflict of Interest</u>.  Hardy covenants and agrees not to consult or provide any services in any manner or capacity to a direct or indirect competitor of TEC during the Consulting Period unless express written authorization to do so is given by TEC.

**(Ex. 1.)**

18.     The Severance Agreement further states:

8. <u>Deferred Compensation</u>.  As additional severance, and in lieu of any and all other payments, compensation, and/or benefits which are claimed or which might be claimed by Hardy, other than the payments, compensation, and benefits expressly payable under the provisions of this Agreement, and as consideration for Hardy's execution of this Agreement and his covenants contained herein, TEC agrees to pay deferred compensation to Hardy in the amount of $700,000.00, payable in five equal annual installments of $140,000.00 each, without interest, beginning on the anniversary date of the Effective Date of this Agreement.

**(Ex. 1.)**

19.     TEC has paid Hardy three out of the five deferred compensation payments pursuant to the Severance Agreement in the total amount of $420,000.00. These payments were made on May 24, 2013, May 24, 2014, and May 24, 2015, respectively.  Hardy was in breach of the Severance Agreement at the time each payment was made.

20.     The Severance Agreement also provides: "In any action involving any dispute regarding this Agreement, the prevailing party shall be entitled to recover its reasonable costs of collection, including reasonable attorney's fees." **(Ex. 1.)**

9

21.     On or around April 3, 2007, Hardy entered into a Stock Option Award Agreement

("2007 Stock Option Agreement") with TEC wherein he agreed to the following:

> 11.     Non-Compete Covenant.  The Option Holder agrees that in
> consideration of receiving this Option that the Option Holder will
> not compete directly or indirectly compete with the products or
> services offered by the Company while employed and for a period
> of five (5) years after termination of employment.  The Option
> Holder further agrees that while employed by the Company the
> Option Holder had access to proprietary and confidential
> information that may not be used for any reason after termination
> of employment.

A copy of the 2007 Stock Option Agreement is attached hereto as **Exhibit 3.**

22.     On or around 29, 2011, Hardy entered into a Stock Option Award Agreement

("2011 Stock Option Agreement") with TEC wherein he agreed to the following:

> 11.     Non-Compete Covenant.  The Option Holder agrees that in
> consideration of receiving this Option that the Option Holder will
> not compete directly or indirectly compete with the products or
> services offered by the Company while employed and for a period
> of five (5) years after termination of employment.  The Option
> Holder further agrees that while employed by the Company the
> Option Holder had access to proprietary and confidential
> information that may not be used for any reason after termination
> of employment.

A copy of the 2011 Stock Option Agreement is attached hereto as **Exhibit 4**.

23.     On or around May 5, 2013, Hardy sent an email to TEC employee Ming Cheng

stating, "Some news on TEC. Looks like all divisions are loosing [sic] money. Board meets in

two weeks to consider drastic austerity cutbacks. I think you need to find another job ASAP."  A

copy of the May 5, 2013 email is attached hereto as **Exhibit 5.**

24.     On or around August 14, 2014, Hardy, while still bound under the terms of the

Severance Agreement, the Employment Agreement, and the 2007 and 2011 Stock Option

Agreements, formed and began operating Power Measurements, LLC.

10

25.     Hardy's LinkedIn page has indicated that he is a Principal at Power Measurements and has operated in that capacity from March 2012 through the present.  The description of his experience at Power Measurements states, "Technical consulting in a variety of fields including power measurement, electricity metering, nuclear spectroscopy, x-ray spectroscopy, systems design, and project management."

26.     On or around March 6, 2015, Hardy sent an email to TEC employee Ming Cheng and two other individuals associated with a vendor in China.  A copy of the March 6, 2015 email is attached as **Exhibit 6**.  In the March 6, 2015 email, Hardy discusses Power Measurements' desire to partner with a vendor in China for his Electric Vehicle Supply Equipment ("EVSE") product and a technology for "very high accuracy power measurement," which he notes will be "broadly applicable to many things post 2017," and "[a]lso applicable to very high accuracy meters."  **(Ex. 6.)**

27.     One of Power Measurements' websites, which can be located at http://www.powermeasurements.com/about/default.html, states:

> Power Measurements is sole proprietorship directed by Dr. William (Bill) Hardy.  Bill has over a decade of experience and leadership in the field of power measurement.  He also has over 40 years of experience as a scientist, engineer, entrepreneur, and manager in many high technology fields.  Power Measurements provides a wide variety of services using Bill's expertise and a network of technical resources.

28.     In or around 2015, Power Measurements created a test website, which was located at http://test.powermeasurements.com/products-and-applications ("Test Website").

29.     Power Measurements' Test Website stated the following:

> Power Measurements Incorporated (PMI) plans to develop and manufacture three broad classes of products Test Instrumentation Electricity Metering Services Power Monitoring Devices [.]  For all these products the core competency is the accurate measurement of AC/DC wave forms and quantities derived from

11

them such as Active Energy (kWh), Reactive Energy (VARh), and Apparent Energy (VAh).  These Products will address a number of different markets and applications.  EVSE Testing[,] Testing of Electricity Meters[,] Field Testing of Electricity Metering Sites[,] [and] Sub-metering Power Quality Monitoring.

30.     Power Measurements' Test Website further provided:

Power Measurement Incorporated (PMI) is a PEZA-registered research and development (R&D) & product assembly company that delivers total solutions in the field of test instrumentation and electricity power metering systems.

The company's CEO, William Hardy, Ph.D., is an internationally recognized authority on power measurement and serves on the ANSI C12 Standards Committee where he chairs several subcommittees including the committee writing standards for field testing, power measurements under non-sinusoidal conditions and harmonization of US and international standards.  He also teaches at many metering schools in the US.

Power Measurement Incorporated (PMI) was established to create a center of technical expertise in the development of test equipment and products for the measurement of electric power.

The founder, William Hardy, Ph.D., has been an international leader in the development of equipment in this field for over a decade.  He serve [sic] on Chairs of several US ANSI Standards committees in this field.

31.     Power Measurements' Test Website further provided that "Dr. Hardy's goal is to create an entrepreneurial company that can become a world leader in the Design and Production of equipment for the Electric Power Industry…."

32.     In or around 2015, Power Measurements launched another website, which is currently located at http://new.powermeasurements.com/ ("New Website").

33.     Powers Measurements is or has conducted business in Cebu, Philippines. According to the New Website, "Dr. Hardy chose Cebu as a location for this endeavor because

12

he was inspired by interactions with local engineers he had met through use as independent contractors."

34.    The New Website provides the following:

A Philippine-based startup company that is a research and development (R&D) & product assembly company that delivers total engineering solutions in the field of test instrumentations and electricity power metering systems.

35.    Electricity power metering systems is a field in which TEC operates, and Power Measurements and Bill Hardy are directly competing with TEC in this field.

36.    TEC, through its Powermetrix division, developed a family of products known as the "PowerMaster." The PowerMaster product line has revolutionized field and laboratory testing within the electric utility, meter manufacturing, and metrology industries.

37.    TEC invested significant capital to develop the PowerMaster product line.

38.    Rather than acting in accordance with the terms of the Severance Agreement, Employment Agreement, and 2007 and 2011 Stock Option Agreements, Hardy set up Power Measurements and created its business plans using TEC's confidential and proprietary information and trade secrets to directly compete with TEC in the electricity power metering field.

39.    On or around May 27, 2014, Power Measurements filed an application for a patent with the United States Patent and Trademark Office ("USPTO") that contains TEC's proprietary information.  The USPTO issued U.S. Patent 9,020,771 ("the '771 Patent") to Power Measurements for "Devices and methods for testing the energy measurement accuracy, billing accuracy, functional performance and safety of electric vehicle charging stations." Hardy is listed as the sole inventor of the '771 Patent.

13

40.     The design aspects of the '771 Patent are taken directly from Hardy's experience while working at TEC. Hardy took a large part of TEC's Waveform Analyzer design, which is used in its PowerMaster product line, and applied it to the '771 Patent.  The '771 Patent, among other similarities, replicated and/or copied in large part TEC's Waveform Analyzer circuit topology, which consists of a toroidal transformer, burden resistor, single ended to differential amplifier, and a high-resolution ADC converter.  This is the same technology and proprietary information that was used and developed in the TEC Powermetrix division when Hardy was employed at TEC.

41.     The '771 Patent further utilizes the 19.66 megahertz frequency crystal that TEC uses in its PowerMaster products.

42.     The '771 Patent replicated errors contained in TEC's confidential and proprietary PowerMaster documents, including typographical and mathematical errors.

43.     TEC spent significant capital to develop the technology that Hardy has disclosed to the public in the Hardy patent.

44.     Hardy has disclosed TEC's trade secrets, confidential and proprietary information, technology, formulas, and equations to the public by filing such information in the patent application that issued as the '771 Patent.

45.     Hardy was obligated under the Employment Agreement, the Severance Agreement, and the 2007 and 2011 Stock Option Agreements to maintain confidentiality of TEC's trade secrets and proprietary and confidential information.

46.     Power Measurements is the recipient of and gained access to TEC's trade secrets, confidential and proprietary information, technology, formulas, and equations by virtue of Hardy's employment with TEC in Knoxville, Tennessee.

14

47.     Utilizing information and resources wrongfully pirated from TEC, Hardy proceeded to create a business that is in competition with TEC's Powermetrix division.

48.     Hardy and Power Measurements will attempt to divert sales and customers, and employees from TEC, if it has not done so already.

49.     Hardy has engaged in this conduct in furtherance of this personal business interest in Power Measurements – at the expense of and harm to TEC's business interest.

## IV.  CAUSES OF ACTION

### COUNT I

**BREACH OF CONTRACT**
**EMPLOYMENT AGREEMENT – CONFIDENTIALITY**
**(Defendant Hardy)**

50.     TEC repeats and incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein.

51.     In the Employment Agreement signed by Hardy on December 8, 2003, he agreed to the following:

> I will not, during my employment by TEC or thereafter without TEC's written approval,  disclose to others nor use for my own benefit or the future benefit of any other individual or firm, data and information which is not generally known, which relates to my work or which relates to the actual or anticipated business, products, services or projects of TEC or similar data and information of other individuals or organization to which I may gain access in the course of my employment or by reason of such employment.

**(Ex. 2.)**

52.     The Employment Agreement is enforceable.

53.     Hardy breached the Employment Agreement by disclosing TEC's trade secrets, proprietary and confidential information, data, technology, and formulas related to the

15

PowerMaster product line, which he gained access to by virtue of his employment with TEC, to Power Measurements for his own benefit and the benefit of Power Measurements.

54.     Hardy breached the Employment Agreement by disclosing TEC's trade secrets, proprietary and confidential information, data, technology, and formulas related to the PowerMaster product line, which he gained access to by virtue of his employment with TEC, to the public by filing the patent application that issued as the '771 Patent for his own benefit and the benefit of Power Measurements.

55.     At no time did TEC give Hardy written approval to disclose such information.

56.     Because of Hardy's breach of the confidentiality provisions of the Employment Agreement, TEC has suffered damages.

## COUNT II

### BREACH OF CONTRACT
### SEVERANCE AGREEMENT – CONFIDENTIALITY
### (Defendant Hardy)

57.     TEC repeats and incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein.

58.     In the Severance Agreement, Hardy acknowledged and reaffirmed the terms of the Employment Agreement, and agreed to the following:

> [Hardy] shall not, without TEC's prior written approval, "disclose to others nor use for his own benefit or the future benefit of any other individual or firm, data and information which is not generally known, which relates to his work or which relates to the actual or anticipated business, products, services or projects of TEC or similar data and information of other individuals or organization to which he has gained access in the course of his employment with TEC."

**(Ex. 1.)**

16

59.     Hardy further acknowledged and reaffirmed the terms of the 2007 and 2011 Stock

Option Agreements as follows:

> . . . [Hardy] is prohibited from using at any time for any reason any "proprietary and confidential information" of TEC to which he had access during his employment by TEC. Hardy hereby acknowledges and reaffirms such obligations.

**(Ex. 1.)**

60.     Hardy additionally agreed to the following in the Severance Agreement:

> In order for Hardy to perform the Consulting Services, Hardy will remain exposed to TEC's Confidential Information (as defined below), and Hardy agrees to use such information only in the best interests of TEC. Hardy further agrees that he shall not, without the prior written authorization of TEC, directly or indirectly use, divulge, furnish or make accessible to any company, person or other entity any Confidential Information (as defined below), but instead shall keep all Confidential Information strictly and absolutely confidential.  Further, Hardy will take all actions reasonably required of him to prevent his employees, agents, representatives, as the case may be, from using or divulging such information in a manner or for a purpose that may be contrary to the best interests of TEC.

**(Ex. 1.)**

61.     The Severance Agreement defines "Confidential Information" as follows:

> [T]rade secrets concerning the business of TEC, product specifications, know-how, processes, records, customer and supplier lists and the location of any such customers or suppliers, current and anticipated customer requirements, price lists, market studies, business plans, any information, however documented, that is a trade secret under applicable law, and all other information associated with the products and services of TEC.

**(Ex. 1.)**

62.     The Severance Agreement is enforceable.

63.     Hardy breached the Severance Agreement by disclosing TEC's trade secrets,

proprietary and confidential information, data, technology, and formulas related to the

17

PowerMaster product line, which he gained access to by virtue of his employment with TEC, to Power Measurements for his own benefit and the benefit of Power Measurements.

64.     Hardy breached the Severance Agreement by disclosing TEC's trade secrets, proprietary and confidential information, data, technology, and formulas related to the PowerMaster product line, which he gained access to by virtue of his employment with TEC, to the public by filing the patent application that issued as the '771 Patent for his own benefit and the benefit of Power Measurements.

65.     At no time did TEC give Hardy written approval to disclose such information.

66.     Because of Hardy's breach of the confidentiality provisions of the Severance Agreement, TEC has suffered damages, including but not limited to the three deferred compensation payments made to Hardy in the total amount of $420,000.00.

67.     TEC is entitled to permanent injunctive relief under Paragraph 12(e) of the Severance Agreement.

68.     TEC is entitled to its attorney's fees and costs under Paragraph 27(c) of the Severance Agreement.

### COUNT III

**BREACH OF CONTRACT**
**2007 & 2011 STOCK OPTION AGREEMENTS – CONFIDENTIALITY**
**(Defendant Hardy)**

69.     TEC repeats and incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein.

70.     In the 2007 and 2011 Stock Option Agreements, Hardy agreed "that while employed by the Company [he] had access to proprietary and confidential information that may not be used for any reason after termination of employment."  **(Exs. 3 & 4.)**

18

71.     The 2007 and 2011 Stock Option Agreements are enforceable.

72.     Hardy breached the 2007 and 2011 Stock Option Agreements by disclosing TEC's trade secrets, proprietary and confidential information, data, technology, and formulas related to the PowerMaster product line, which he gained access to by virtue of his employment with TEC, to Power Measurements for his own benefit and the benefit of Power Measurements.

73.     Hardy breached the 2007 and 2011 Stock Option Agreements by disclosing TEC's trade secrets, proprietary and confidential information, data, technology, and formulas related to the PowerMaster product line, which he gained access to by virtue of his employment with TEC, to the public by filing the patent application that issued as the '771 Patent for his own benefit and the benefit of Power Measurements.

74.     Because of Hardy's breach of the confidentiality provisions in the 2007 and 2011 Stock Option Agreements, TEC has suffered damages.

## COUNT IV

**BREACH OF CONTRACT**
**2007 & 2011 STOCK OPTION AGREEMENTS – NON-COMPETITION**
**(Defendant Hardy)**

75.     TEC repeats and incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein.

76.     In the 2007 and 2011 Stock Option Agreements, Hardy agreed that he "will not compete directly or indirectly compete with the products or services offered by the Company while employed and for a period of five (5) years after termination of employment." **(Exs. 3 & 4.)**

77.     The 2007 and 2011 Stock Option Agreements are enforceable.

78.     Hardy breached the 2007 and 2011 Stock Option Agreements through his involvement with Power Measurements, which is competing directly and indirectly with TEC's Powermetrix division in the field of electricity power metering systems and AC Power Measurement.

79.     Hardy breached the 2007 and 2011 Stock Option Agreements through his involvement with Power Measurements and the development of technology and products that are to be used for very high accuracy power measurement.

80.     Because of Hardy's breach of the non-competition provisions in the 2007 and 2011 Stock Option Agreements, TEC has suffered damages.

## COUNT V

### BREACH OF CONTRACT
### SEVERANCE AGREEMENT – NON-COMPETITION
### (Defendant Hardy)

81.     TEC repeats and incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein.

82.     In the Severance Agreement, Hardy acknowledged and reaffirmed the terms of the 2007 and 2011 Stock Option Agreements as follows:

> Hardy also acknowledges that the terms of the 2007 and 2011 Stock Option Award Agreements require that for a period of five years after the Termination Date, Hardy shall "not compete directly or indirectly with the products or services" which were offered by TEC during the term of his employment . . .

**(Ex. 1.)**

83.     Hardy further agreed to that he will not without prior, written consent of TEC:

> (1) induce or attempt to induce any customer of or supplier to TEC to cease or reduce its business or other relationship with TEC or any of its Affiliates, or otherwise interfere with the relationship between TEC or any of its Affiliates and any such person, entity or

organization; (ii) engage, directly or indirectly, in any activity with any current customer of TEC anywhere in the world that is competitive with the business of TEC; or (iii) engage, directly or indirectly, in any activity anywhere in the world that is competitive with the business of TEC. For purposes of this Agreement, "engage" shall mean having any direct or indirect interest in any person, entity or organization, whether as an owner, stockholder, partner, member, joint venturer, creditor, director, officer, employee, consultant, independent contractor or otherwise, or rendering any direct or indirect service or assistance to any person, entity or organization (whether as an agent, consultant, or otherwise). . . .The provisions of this <u>Section 12(b)</u> shall remain in effect for a period of five years after the Termination Date.

**(Ex. 1.)**

84.     The Severance Agreement is enforceable.

85.     Hardy breached the Severance Agreement through his involvement with Power Measurements, which is competing directly and indirectly with TEC's Powermetrix division in the field of electricity power metering systems and AC Power Measurement.

86.     Hardy breached the Severance Agreement through his involvement with Power Measurements and the development of technology and products that are to be used for high accuracy power measurement.

87.     Because of Hardy's breach of the non-competition provision in the Severance Agreement, TEC has suffered damages, including but not limited to the three deferred compensation payments made to Hardy in the total amount of $420,000.00.

88.     TEC is entitled to permanent injunctive relief under Paragraph 12(e) of the Severance Agreement.

89.     TEC is entitled to its attorney's fees and costs under Paragraph 27(c) of the Severance Agreement.

21

## COUNT VI

**BREACH OF CONTRACT**
**SEVERANCE AGREEMENT – NON-SOLICITATION**
**(Defendant Hardy)**

90.     TEC repeats and incorporates the allegations set forth in the preceding paragraphs

as if fully set forth herein.

91.     In the Severance Agreement, Hardy agreed to the following:

> [Hardy] shall not directly or indirectly: (i) take any action to solicit
> or divert any business (or potential business) or clients or
> customers (or potential clients or potential customers) away from
> TEC; (ii) induce customers, potential customers, clients, potential
> clients, suppliers, agents or other persons under contract or
> otherwise associated or doing business with TEC, to reduce or alter
> any such association or business with or from TEC; or (iii) induce
> any person in the employment of TEC or any consultant to TEC to
> (A) terminate such employment or consulting arrangement, (B)
> accept employment or enter into any consulting arrangement with
> anyone other than TEC, or (C) interfere with the customers,
> suppliers, or the clients of TEC in any manner or the business of
> TEC in any manner. For purposes of this Agreement, a "potential
> client" or a "potential customer" shall mean a person or entity that
> TEC: (i) is or will be in the reasonably foreseeable future soliciting
> or considering soliciting (or has targeted for solicitation, or will be
> so targeting in the reasonably foreseeable future); or (ii) has, at any
> time or from time to time been soliciting for or in respect of any
> current, actively pending or contemplated product lines, businesses
> or services offered by TEC. Also for purposes of this Agreement,
> "potential business" shall mean any current or reasonably
> foreseeable commercial activity or any current or reasonably
> foreseeable commercial opportunities associated in any way with
> TEC. The provisions of this Section 12(c) shall remain in effect for
> a period of five years after the Termination Date.

92.     The Severance Agreement is enforceable.

93.     On or around May 5, 2013, Hardy breached the Severance Agreement when he

sent an email to TEC's employee, Ming Cheng, stating that Ming Cheng should "find another

job ASAP." **(Ex. 5.)**  Such action was to induce a TEC employee to terminate his employment with TEC.

94.     On or around March 6, 2015, Hardy breached the Severance Agreement when he sent an email to TEC's potential clients and potential customers of TEC to solicit and divert potential or clients or customers (or potential clients or potential customers) away from TEC. (Ex. 6.)   Hardy took action to divert potential business from TEC in high accuracy power measurement and meters on behalf of Power Measurements.  **(Ex. 6.)**

95.     Because of Hardy's breach of the non-solicitation provision in the Severance Agreement, TEC has suffered damages, including but not limited to the three deferred compensation payments made to Hardy in the total amount of $420,000.00.

96.     TEC is entitled to permanent injunctive relief under Paragraph 12(e) of the Severance Agreement.

97.     TEC is entitled to its attorney's fees and costs under Paragraph 27(c) of the Severance Agreement.

## COUNT VII

### BREACH OF TENNESSEE UNIFORM TRADE SECRETS ACT
### Tenn. Code Ann. § 47-25-1701, *et seq.*
### (ALL DEFENDANTS)

98.     TEC repeats and incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein.

99.     Hardy and Power Measurements have violated the Tennessee Uniform Trade Secrets Act ("TUTSA"), Tenn. Code Ann. § 47-25-1701, *et seq.*

100.    The confidential information misappropriated by Defendants constitutes trade secrets within the meaning of the TUTSA because it derives independent economic value, actual

or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

101.   TEC took reasonable measures to keep its trade secrets confidential.  As stated above, only certain individuals had access to the trade secrets.  Trade secret information was provided only to those who, like Hardy, agreed to keep such information confidential.

102.   TEC spent considerable sums of money, developing, researching, acquiring, maintaining, and guarding this information.

103.   Defendants have willfully and maliciously misappropriated the trade secrets, in that Defendants have retained and taken TEC's trade secrets for their own benefit and to the detriment of TEC.

104.   Defendants misappropriated TEC's trade secrets by acquiring them through improper means, including conversion and Hardy's breach of his duty to maintain secrecy under the Employment Agreement, Severance Agreement, and 2007 and 2011 Stock Option Agreements.

105.   Defendants are now disclosing and/or using these trade secrets without TEC's consent.

106.   There is a substantial threat that Defendants will continue to use and disclose the trade secrets in an effort to compete with TEC and its Powermetrix Division.

107.   Defendants' misappropriation of the trade secrets and use of them to develop competing products with TEC has caused TEC to sustain actual loss, including, but not limited to, lost profits and damage to good will and reputation.

108.    As a direct and proximate result of Defendants' wrongful conduct, TEC has suffered and will continue to suffer irreparable damage and money damages unless enjoined.

109.    Because Hardy's misappropriation was willful and malicious, the TUTSA also authorizes the recovery of punitive damages and TEC's attorneys' fees.

110.    Hardy and Power Measurements have used "improper means" as defined by the Trade Secrets Act to "misappropriate" TEC's trade secrets for the benefit Power Measurements. Tenn. Code Ann. § 47-25-1702, *et seq.*

111.    Upon information and belief, when Power Measurements acquired TEC's trade secrets, Power Measurements knew or had reason to know that the trade secrets were acquired by improper means. Tenn. Code Ann. § 47-25-1702, *et seq.*

112.    Power Measurements, had reason to know it had acquired TEC's trade secrets by "improper means because at the time of disclosure:

   a.   Power Measurements derived TEC's trade secrets from or through a person – specifically Hardy – who had utilized improper means to acquire it.  Tenn. Code Ann. § 47-25-1702, *et seq.*;

   b.   Power Measurements knowingly acquired TEC's trade secrets under circumstances giving rise to a duty to maintain their secrecy or limit their use. Tenn. Code Ann. § 47-25-1702.

113.    Power Measurements, by using "improper means", has acquired TEC's trade secrets as defined by the TUTSA, including such proprietary information as technology, equations, formulas, patterns, compilations, programs, devices, methods, techniques, or processes from its PowerMaster product line that: (i) derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper

25

means by, other persons who can obtain economic value from its disclosure or use, and such information was and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Tenn. Code Ann. § 47-25-1702(4).

114.    Power Measurements and Hardy continue to use TEC's misappropriated trade secrets to conduct business and to gain a commercial advantage over TEC.

115.    TEC is entitled to an award of money damages from Hardy and Power Measurements for their misappropriation of its trade secrets, including damages for actual losses to TEC as well as the unjust enrichment of Hardy and Power Measurements. Tenn. Code Ann. § 47-25-1704.

116.    Defendants' misappropriation of TEC's trade secrets was willful and malicious.

117.    Defendants' willful and malicious misappropriation of TEC's trade secrets entitles TEC to exemplary damages under the Tenn. Code Ann. § 47-25-1704(b).

118.    Defendants' willful and malicious misappropriation of TEC's trade secrets entitles TEC to a judgment for its reasonable attorney fees under the Trade Secrets Act, and TEC seeks an award of such fees. Tenn. Code Ann. § 47-25-1705.

## **COUNT VIII**

### **DECLARATORY JUDGMENT THAT TEC HAS NO FURTHER OBLIGATIONS UNDER THE SEVERANCE AGREEMENT (HARDY)**

119.    TEC repeats and incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein.

120.    Hardy has breached the terms of the Severance Agreement as more fully described hereinabove.

26

121.    Hardy's breach of the Severance Agreement has caused TEC to suffer damages as more fully described hereinabove.

122.    Because Hardy has breached the terms of the Severance Agreement, in addition to the other relief sought herein, TEC seeks a declaration from this Honorable Court that it has no obligation to make the two remaining payments to Hardy under the Severance Agreement that Hardy has breached.

## COUNT IX

### INJUNCTIVE RELIEF
### (ALL DEFENDANTS)

123.    TEC repeats and incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein.

124.    Paragraph 12(e) of the Severance Agreement provides that a violation of the confidentiality, non-competition, non-solicitation, or non-disparagement provisions of the Severance Agreement "would cause immediate and irreparable harm to TEC, and that damages for such harm would be difficult to calculate." **(Ex. 1.)**

125.    In the Severance Agreement, Hardy agreed "that TEC may seek an injunction, temporary, permanent or otherwise, restraining order or such other equitable relief as may be available to prevent or restrain Hardy's breach of this Section 12, without the necessity of showing actual damages or posting a bond or other security." **(Ex. 1.)**

126.    Because of Hardy's competition with TEC in his involvement with Power Measurements, TEC has been harmed and will continue to be harmed unless the injunctive relief requested herein is granted forthwith by this Court.

127.    TEC is additionally entitled to injunctive relief pursuant to the TUTSA, Tenn. Code Ann. § 47-25-1703.

128.    Because of Defendants' use of TEC's trade secrets, confidential and proprietary information, and technology, formulas, and equations, TEC has been harmed, and will continue to be harmed, unless the injunctive relief requested herein is granted by this Court.

129.    Indeed, as a result of the substantial investment of time, effort, and money by TEC in developing its technologies and formulas, Hardy and Power Measurements were able to build upon the very confidential and proprietary information and trade secrets which Hardy and Power Measurements now seek to wrongfully exploit for their own benefit.

130.    Therefore, Defendants have caused TEC irreparable harm that it has, and will continue to suffer, if the injunctive relief requested herein is denied.

131.    By virtue of the verified allegations and facts set forth herein, TEC has demonstrated a reasonable likelihood of success on the merits and that a balancing of the equities favors the issuance of an injunction against Defendants.

132.    The public interest will not be disserved by the issuance of an injunction.

133.    Unless Defendants are permanently enjoined from the foregoing misconduct, TEC will be irreparably harmed by:

    a.  Defendants' wrongful use and continued misappropriation of TEC's confidential and trade secret information for their continued competition with TEC;

    b.  Loss of business, goodwill, competitive advantage, and market position as Defendants exploit TEC's confidential and trade secret information that is owned and developed exclusively by TEC, but which Defendants have wrongfully misappropriated;

    c.  Present economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable; and

28

    d.   No adequate remedy at law.

134.   **THIS IS THE PLAINTIFF'S FIRST APPLICATION FOR EXTRAORDINARY RELIEF IN THIS ACTION, AND UNLESS DEFENDANTS ARE ENJOINED FROM PERFORMING SERVICES IN COMPETITION WITH PLAINTIFF, PLAINTIFF WILL SUFFER IRREPARABLE INJURY AND HARM BEFORE NOTICE CAN BE SERVED AND A HEARING HELD THEREON**.

**COUNT X**
**PATENT INVALIDITY**
**INEQUITABLE CONDUCT**
**(Defendant Hardy)**

135.   TEC repeats and incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein.

136.   Upon information and belief, during his tenure at TEC, Hardy acquired knowledge of prior art regarding electric power metering that is material to the invention of Hardy's the '771 Patent.

137.   Federal regulation 37 C.F.R. § 1.56 ("Rule 56") requires an inventor to disclose to the USPTO during the prosecution of his/her patent application material prior art that is known to him/her.

138.   Rule 56 provides that failure to disclose known material prior art constitutes inequitable conduct before the USPTO.

139.   Rule 56 provides that a determination that an inventor has committed inequitable conduct by deliberately and knowingly failing to disclose material prior art with an intent to deceive the USPTO during the prosecution of his/her patent application results in the invalidation of the inventor's patent.

140.    As a result of his knowledge of the PowerMaster product line, Hardy knew of the materiality of the technical specifications, circuit designs, and proprietary information concerning various products within the PowerMaster product line.

141.    For instance, during the prosecution of the application which led to the issuance of the '771 patent, i.e. Application No. 14/489,724, (hereinafter "the '724 application"), Hardy identified certain sales brochures for the PowerMaster 5 Series, True Three Phase Analyzing Reference Standard with Internal Three Phase Current Source, and the PowerMaster 7 Series, True Three Phase Analyzing Reference Standard with Internal Three Phase Current and Voltage Source, (collectively referred to herein as "the PowerMaster references"), attached hereto as **Exhibit 7**, as prior art. However, Hardy improperly withheld the date of the PowerMaster references.

142.    As a result of Hardy's improperly withholding the date of the PowerMaster references, the information referred to therein was not considered by the Examiner during examination of the '724 application.

143.    Upon information and belief, Hardy knew that the Examiner did not consider the PowerMaster references during examination of the '724 application; and Hardy failed to disclose the dates of the PowerMaster references to the Examiner.

144.    Further, upon information and belief, during prosecution of the '724 application, Hardy intentionally, deliberately and knowingly failed to disclose material prior art regarding electric power metering, namely, the POWERMASTER 4 SERIES Automated Meter Tester brochure, the "Marketing Spec 3300" document, the "Marketing Spec 5 Series" document, the "Marketing Spec 7 Series" document, the "PowerMaster Phase Current Channel" document, the "PowerMaster Phase Voltage Channel" document, the "PowerMaster Data Processing"

30

document, the "PowerMaster Phase Data Processing" document, the "Data Acquisition Process for PowerMaster" document, the "WFA FPGA Functionality 110426" document, the "New Product Specification 070924X" document, and the "Lowleveldataacquisition 081231" document, (collectively referred to herein as "the PowerMaster documentation").

145.    In the Notice of Allowability issued by the Examiner on December 17, 2014, for the '724 application, the Examiner indicated that Independent Claim 1 was allowable because:

> the closest prior art of record either singularly or in combination fails to anticipate or render obvious the combination wherein "one or more measuring devices which simultaneously make sampling measurements of voltage and current from one or more supply lines delivering power from the EVCS to a load after the charging cable has been received at the primary port; digital processing means configured to calculate a first value of active energy delivered by the EVCS to the load from the sampling measurements obtained from the one or more measuring devices; and at least one output device for displaying or transmitting the first value of active energy delivered or one or more values determined from the first value of active energy delivered for comparison with a metered value of active energy delivered as given by the EVCS" in combination with other limitations in the claims as defined by Applicant(s).

146.    With regard to the limitation in Claim 1 "one or more measuring devices which simultaneously make sampling measurements of voltage and current from one or more supply lines delivering power from the EVCS to a load after the charging cable has been received at the primary port," the documents identified in the PowerMaster Documentation either singularly or in combination anticipate this limitation and/or would render this limitation obvious to one having ordinary skill in the art.

147.    With regard to the limitation in Claim 1 "digital processing means configured to calculate a first value of active energy delivered by the EVCS to the load from the sampling measurements obtained from the one or more measuring devices," the documents identified in

the PowerMaster Documentation either singularly or in combination anticipate this limitation and/or would render this limitation obvious to one having ordinary skill in the art.

148.   With regard to the limitation in Claim 1 "at least one output device for displaying or transmitting the first value of active energy delivered or one or more values determined from the first value of active energy delivered for comparison with a metered value of active energy delivered as given by the EVCS," the documents identified in the PowerMaster documentation either singularly or in combination anticipate this limitation and/or would render this limitation obvious to one having ordinary skill in the art.

149.   In the Notice of Allowability issued by the Examiner on December 17, 2014, in the '724 application, the Examiner indicated that Independent Claim 22 was allowable because:

> the closest prior art of record either singularly or in combination fails to anticipate or render obvious the combination wherein "making sampling measurements of voltage and current simultaneously from one or more supply lines delivering power from the EVCS to a load after the charging cable has been received at the primary port; calculating a first value of active energy delivered by the EVCS to the load from the sampling measurements with a digital processing means; and displaying or transmitting the first value of active energy delivered or one or more values determined from the first value of active energy delivered with at least one output device for comparison with a metered value of active energy delivered as given by the EVCS" in combination with other limitations in the claims as defined by Applicant(s).

150.   With regard to the limitation in Claim 22 "making sampling measurements of voltage and current simultaneously from one or more supply lines delivering power from the EVCS to a load after the charging cable has been received at the primary port," the documents identified in the PowerMaster Documentation either singularly or in combination anticipate this limitation and/or would render this limitation obvious to one having ordinary skill in the art.

32

151.    With regard to the limitation in Claim 22 "calculating a first value of active energy delivered by the EVCS to the load from the sampling measurements with a digital processing means," the documents identified in the PowerMaster Documentation either singularly or in combination anticipate this limitation and/or would render this limitation obvious to one having ordinary skill in the art.

152.    With regard to the limitation in Claim 22 "displaying or transmitting the first value of active energy delivered or one or more values determined from the first value of active energy delivered with at least one output device for comparison with a metered value of active energy delivered as given by the EVCS," the documents identified in the PowerMaster documentation either singularly or in combination anticipate this limitation and/or would render this limitation obvious to one having ordinary skill in the art.

153.    The improperly withheld PowerMaster documentation is not cumulative of any art actually considered by the Examiner.

154.    The technology of the improperly withheld PowerMaster documentation will be recognized by those skilled in the art as analogous to the art of devices and methods for testing electronic vehicle charging stations described in the '771 Patent using the same or similar electrical circuits, formulas, and algorithms to perform energy measurement, to test the accuracy and performance of electrical meters.

155.    Upon information and belief, had the PowerMaster documentation been properly disclosed to the PTO, the '771 Patent would not have issued.

156.    Hardy did not disclose the PowerMaster documentation to the USPTO.

157.    Upon information and belief, Hardy knowingly failed to disclose such prior art with the intent to deceive the USPTO.

33

158.    Such conduct constitutes inequitable conduct that would render the '771 Patent invalid.

159.    Because of Hardy's inequitable conduct during prosecution of his patent application, the '771 Patent is invalid and unenforceable *in toto*.

160.    Based on Hardy's inequitable conduct and the existence of an actual case or controversy between Hardy and TEC, TEC is entitled to a declaration that the '771 Patent is invalid and all of the claims of the '771 Patent are unenforceable.

161.    TEC is entitled to its attorney's fees and costs under 35 U.S.C. § 285.

## V.  REQUEST FOR RELIEF (ALL COUNTS)

WHEREFORE, PLAINTIFF TEC, respectfully requests judgment in its favor and against Defendants, and respectfully requests that the Court:

(1)    Issue a permanent injunction:

    (a)    Enjoining and restraining Defendants Hardy for himself, or on behalf of or in conjunction with any other person, partnership, corporation, or association, from directly or indirectly competing with the business of TEC; and

    (b)    Enjoining and restraining Defendants from, directly or indirectly, whether alone or in concert with others, including any agent of Hardy and/or Power Measurements, from using or disclosing TEC's confidential information and trade secrets;

(2)    Award TEC all of its direct and consequential damages against Defendants, including, but not limited to damages on account of lost profits and revenues, damages to good will, disgorgement of amounts received by Defendants, the three

34

deferred compensation payments made to Hardy while he was breaching the Severance Agreement, interest, attorneys' fees and costs, in the amount proven at trial incurred as a result of Defendants' wrongful conduct;

(3)     Award TEC exemplary damages it proves at trial, together with its attorneys' fees, as provided in the Tennessee Uniform Trade Secrets Act;

(4)     Issue a declaratory judgment that the '771 Patent is invalid and unenforceable;

(5)     Award TEC its attorneys' fees under 35 U.S.C. § 285;

(6)     Award TEC its attorneys' fees and costs pursuant to the terms of the Severance Agreement;

(7)     Issue a declaratory judgment that TEC is not obligated to make any future payments to Hardy pursuant to the Severance Agreement, due to Hardy's material breach of the Severance Agreement; and

(8)     Award TEC such other and further relief as the Court deems just and proper.


Respectfully submitted this 19th day of February, 2016.

                                        s/John E. Winters
                                        John E. Winters (BPR# 016345)
                                        Bryce E. Fitzgerald (BPR# 033289)
                                        KRAMER RAYSON LLP
                                        P. O. Box 629
                                        Knoxville, TN  37901-0629
                                        (865) 525-5134
                                        jwinters@kramer-rayson.com

                                        s/Robert E. Pitts
                                        Robert E. Pitts (Tenn. BOPR# 01610)
                                        rpitts@pl-iplaw.com
                                        Andrew C. Lake (Tenn. BOPR# 29952)
                                        alake@pl-iplaw.com
                                        Jacob G. Horton (Tenn. BOPR# 25467)
                                        jhorton@pl-iplaw.com

35

Raymond E. Stephens (Tenn. BOPR# 15037)
rstephens@pl-iplaw.com
PITTS & LAKE, P.C.
P.O. Box 51295
Knoxville, Tennessee 37950-1295
Phone: (865) 584-0105
Fax: (865) 584-0104

*Attorneys for Plaintiff Technology for Energy
Corporation*

# EXHIBIT 1

## SEVERANCE AND RELEASE AGREEMENT

This SEVERANCE AND RELEASE AGREEMENT (this "Agreement") is made and entered into as of the Effective Date set forth in Section 1 below by and between TECHNOLOGY FOR ENERGY CORPORATION, a Tennessee corporation ("TEC"), and WILLIAM H. HARDY ("Hardy").

## RECITALS

1.      Hardy was formerly an employee and officer (vice-president) of TEC.

2.      Hardy had been employed by TEC since December 8, 2003 and had been a vice-president since April 29, 2011.

3.      On December 8, 2003, Hardy entered into an "Employee Agreement" with TEC, which is in effect and which is incorporated herein by reference.

4.      On April 3, 2007, Hardy entered into a "Stock Option Award Agreement" with TEC, which is in effect and which is incorporated herein by reference.

5.      On April 29, 2011, Hardy entered into a "Stock Option Award Agreement" with TEC, which was in effect on the Termination Date as defined below, and which is incorporated herein by reference.

6.      Pursuant to the 2007 Stock Option Award Agreement, and as a result of a subsequent stock split, Hardy had on the Termination Date a fully vested option to purchase 20,000 shares of TEC's Class B Common Stock at a price per share of $10.50, in accord with the terms of the option.

7.      Pursuant to the 2011 Stock Option Award Agreement, and as a result of a subsequent stock split, Hardy had no vested rights on his date of separation in accord with the terms of the option.

8.      As a participant in the TEC "Employee Stock Purchase Plan," which is incorporated herein by reference, Hardy has purchased 5,910 shares of TEC's Class B Common Stock.

9.      The stock now owned by Hardy is referred to herein as the "Owned Shares" and the stock as to which Hardy had option rights as of the Termination Date, and would have had option rights as of April 29, 2012 had his employment not terminated prior to that date, is referred to herein as the "Option Shares."

10.     Hardy's Owned Shares and Option Shares are subject to the terms of TEC's "Buy and Sell Agreement" as amended, which is incorporated herein by reference.

11.     Hardy's employment at TEC and his service as an officer of TEC terminated on April 16, 2012 (the "Termination Date").

1

NOW, THEREFORE, in consideration of the foregoing recitals, mutual covenants, conditions and provisions set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      **Effective Date**. The "Effective Date" of this Agreement, as that term shall be used herein, shall be the date on which this Agreement is executed by the last party to execute this Agreement as indicated below such party's signature. This Agreement shall be effective immediately upon execution by both parties, subject only to Hardy's revocation right set forth in <u>Section 19</u> below.

2.      **Return of Property**.  Hardy acknowledges that he has removed all his personal belongings from the offices of TEC. Hardy has already returned his TEC issued laptop computer and a CD containing all of the TEC files that were on his home computer to TEC. Hardy shall also surrender to TEC on the Effective Date any remaining property of TEC in his possession, absent a different method of handling any or all of TEC property in Hardy's possession as specified in writing by TEC and Hardy.

3.      **Hardy's Severance Benefits**.  Hardy shall receive the severance benefits set forth in <u>Section 4</u> through <u>Section 8</u> below.

4.      **Hardy's Accrued Pay and Benefits**.  TEC has paid or shall pay all unpaid base compensation and fringe benefits, including but not limited to any accrued vacation time and any appropriate reimbursement of employee expenses, accrued as of the Effective Date, all in the manner and amounts in accord with TEC's customary policies and procedures.

5.      **Employee Benefit Plans**.  Except as provided herein, from and after the Termination Date Hardy ceased to participate in any accrued benefits under any employee benefit plan, program, policy or arrangement of TEC. Hardy's entitlement to receive any vested accrued benefits or vested accounts under TEC's benefit plans shall be determined in accordance with, and governed by, the respective terms of such plans.

6.      **Hardy's Personal Time Off ("PTO") Hours**.  TEC has paid or shall pay Hardy, as additional severance benefits and as a part of his accrued compensation, an amount in respect to his PTO hours accrued through the Termination Date, such amount to be based on Hardy's regular hourly pay rate.

7.      **Hardy's Option Shares and Owned Shares**.  TEC and Hardy agree that Hardy has not exercised any option to purchase any of the Option Shares, and Hardy hereby releases all rights as to all such Option Shares. In accord with the Buy and Sell Agreement, Hardy agrees to tender his Owned Shares to TEC on or before ninety (90) days of the Termination Date, and TEC agrees to purchase the Owned Shares at the applicable price per share, which the parties hereby agree is $39.00, for a total purchase price of $230,490.00. The purchase price shall be paid in a single cash payment within thirty (30) days following the full and proper delivery by Hardy to TEC of the certificates of ownership for the Owned Shares. Hardy acknowledges that he will be solely responsible for the reporting and payment of any tax due as a result of his sale of the Owned Shares.

8.      **Deferred Compensation**.  As additional severance, and in lieu of any and all

2

other payments, compensation, and/or benefits which are claimed or which might be claimed by Hardy, other than the payments, compensation, and benefits expressly payable under the provisions of this Agreement, and as consideration for Hardy's execution of this Agreement and his covenants contained herein, TEC agrees to pay deferred compensation to Hardy in the amount of $700,000.00, payable in five equal annual installments of $140,000.00 each, without interest, beginning on the anniversary date of the Effective Date of this Agreement.

9.     **Withholding**.  TEC shall be entitled to withhold and pay to governmental authorities taxes and other amounts normally withheld from employee compensation in connection with its payment of any severance benefits to Hardy, in accordance with the applicable law.

10.     **Health Insurance Coverage**.   TEC and Hardy agree that as of the Termination Date Hardy shall have all rights provided by the federal COBRA law or, if applicable, state insurance laws, and by TEC's current group health insurance policies, and no other right or entitlement shall be due from TEC in regard to Hardy's health or medical insurance coverage.

11.     **Consulting Services**.

(a)     Retention as Consultant – Consulting Period. Provided that Hardy timely signs, dates and returns this Agreement and does not subsequently revoke this Agreement pursuant to Section 19  below, TEC hereby retains Hardy, and Hardy hereby agrees to make himself available, upon reasonable notice and at reasonable times, to perform services, as an independent consultant for a period of two (2) years commencing on the Effective Date, and expiring on the second (2nd) anniversary of the Effective Date (the "Consulting Period").

(b)     Consulting Services. During the Consulting Period, Hardy shall be available, upon reasonable notice and at reasonable times (and subject to reasonable unavailability for vacations, illnesses and other business or personal affairs) to consult with TEC's board of directors, officers, and/or employees upon request, regarding matters of TEC business as to which he has knowledge, information and/or experience, including but not limited to TEC's customers, sales, products, and engineering support, and industry interaction (the "Consulting Services"). Absent Hardy's written approval, he shall not be required to spend in excess of twenty (20) hours in a calendar week in the performance of Consulting Services.

(c)     Other Employment. Hardy shall be free to pursue other employment or consulting engagements with third parties, provided that Hardy's other engagements do not unreasonably interfere with the performance of the Consulting Services, and further provided that such engagements do not violate any other provision of this Agreement (including but not limited to the non-compete provisions of Section 12 below). TEC shall not require Hardy to perform the Consulting Services in a manner that would unreasonably interfere with the performance of Hardy's other professional duties, provided that such other professional duties do not violate any other provision of this Agreement (including but not limited to the non-compete provisions of Section 12  below).

(d)     Standard of Conduct. In rendering Consulting Services under this Agreement, Hardy shall conform to high professional standards of work and business ethics. Hardy shall not use time, materials, or equipment of TEC without the prior written consent of TEC. In no

3

event shall Hardy take any action or accept any assistance or engage in any activity that would result in any other person acquiring any rights of any nature in or benefit from the results of work performed by or for TEC by Hardy.

(e)     Confidentiality.  In order for Hardy to perform the Consulting Services, Hardy will remain exposed to TEC's Confidential Information (as defined below), and Hardy agrees to use such information only in the best interests of TEC. Hardy further agrees that he shall not, without the prior written authorization of TEC, directly or indirectly use, divulge, furnish or make accessible to any company, person or other entity any Confidential Information (as defined below), but instead shall keep all Confidential Information strictly and absolutely confidential. Further, Hardy will take all actions reasonably required of him to prevent his employees, agents and representatives, as the case may be, from using or divulging such information in a manner or for a purpose that may be contrary to the best interests of TEC.

(f)     Definition of Confidential Information. For purposes of this Agreement, the term "Confidential Information" shall include, but not by way of limitation, trade secrets concerning the business of TEC, product specifications, know-how, processes, records, customer and supplier lists and the location of any such customers or suppliers, current and anticipated customer requirements, price lists, market studies, business plans, any information, however documented, that is a trade secret under applicable law, and all other information associated with the products and services of TEC. The term "Confidential Information" does not include information which: (i) becomes generally available to the public other than as a result of a disclosure by Hardy; (ii) is received from a third party who did not acquire or disclose such information by a wrongful act; (iii) is or has been independently developed by Hardy without reference to any Confidential Information; (iv) is disclosed pursuant to applicable law or the order or requirement of court, administrative agency or other governmental body, provided, however, that Hardy shall provide prompt notice of such court order or requirement to TEC to enable TEC to seek a protective order or otherwise prevent or restrict such disclosure and Hardy's right to disclose such Confidential Information shall be strictly limited to the extent necessary to comply with such law, order or requirement; or (v) is disclosed with the prior written approval of TEC.

(g)     Property of TEC. Hardy agrees that all plans, manuals and all other specific materials developed by Hardy on behalf of TEC and prior thereto on behalf of TEC in connection with services rendered under this Agreement and prior thereto as an employee of TEC are and shall remain the exclusive property of TEC. Promptly upon the expiration or termination of the Consulting Period, or upon the request of TEC, Hardy shall return to TEC all documents and tangible items, including samples, provided to Hardy or created by Hardy for use in connection with services to be rendered hereunder, including without limitation all Confidential Information, together with all copies and abstracts thereof.

(h)     Deliverable Items. All drawings, models, designs, formulas, methods, documents and tangible items prepared for and submitted to TEC by Hardy in connection with the Consulting Services under this Agreement shall belong exclusively to TEC and shall be deemed to be works made for hire (the "Deliverable Items"). To the extent that any of the Deliverable Items may not, by operation of law, be works made for hire, Hardy hereby assigns to TEC the ownership of copyright or mask work in the Deliverable Items, and TEC shall have the right to obtain and hold in its own name any trademark, copyright, or patent, and any other registrations and similar protection which may be available in the Deliverable

4

Items. Hardy agrees to give TEC or its designees all assistance reasonably required to perfect such rights.

(i)     Outside Services. Hardy shall not use the service of any other person, entity or organization in the performance of Hardy's duties without the prior written consent of TEC. Should TEC consent to the use by Hardy of the services of any other person, entity or organization, no information regarding the services to be performed under this Agreement shall be disclosed to that person, entity or organization until such person, entity or organization has executed an agreement to protect the confidentiality of TEC's Confidential Information and TEC's absolute and complete ownership of all right, title and interest in the work performed under this Agreement in connection with the Consulting Services.

(j)     Conflict of Interest. Hardy covenants and agrees not to consult or provide any services in any manner or capacity to a direct or indirect competitor of TEC during the Consulting Period unless express written authorization to do so is given by TEC.

(k)     Independent Contractor. In providing the Consulting Services, Hardy shall be an independent contractor and not an employee, partner, or co-venturer of, or in any other service relationship with, TEC. Hardy is not authorized to speak for, represent, or obligate TEC in any manner without the prior express written authorization from an officer or director of TEC.

(l)     Taxes. Hardy shall be responsible for all taxes arising from fees and other amounts paid by TEC in connection with the Consulting Services, and shall be responsible for all payroll taxes and fringe benefits of Hardy. Neither federal, nor state, nor local income tax, nor payroll tax of any kind, shall be withheld or paid by TEC on behalf of Hardy. Hardy understands that he is responsible to pay, according to law, Hardy's taxes and Hardy shall, when requested by TEC, properly document to TEC that any and all federal and state taxes have been paid.

(m)     Termination of Consulting Services. TEC may terminate the Consulting Services provisions of this Section 11, at any time without terminating the remaining provisions of this Agreement.

(n)     Additional Terms. Hardy's Consulting Services shall also be subject to the provisions of TEC's standard consulting contract, a copy of which is attached hereto as Exhibit A and incorporated herein by reference, and which Hardy agrees to execute upon the request of TEC, to the extent that such consulting contract is not inconsistent with or in conflict with any of the terms of this Section 11.   TEC and Hardy agree that the hourly rate for the Consulting Services shall be One Hundred Dollars ($100.00).   In the event of any such inconsistency or conflict, the terms most restrictive to Hardy shall govern the Consulting Services.

    12.     **Non-Compete, Non-Solicitation, Non-Disparagement and Confidentiality Covenants**.

(a)     Hardy's Reaffirmation of Terms of Employee Agreement and Buy and Sell Agreement. Hardy acknowledges that the terms of the Employee Agreement require that he shall not, without TEC's prior written approval, "disclose to others nor use for his own

5

benefit or the future benefit of any other individual or firm, data and information which is not generally known, which relates to his work or which relates to the actual or anticipated business, products, services or projects of TEC or similar data and information of other individuals or organization to which he has gained access in the course of his employment with TEC." Hardy also acknowledges that the terms of the 2007 and 2011 Stock Option Award Agreements require that for a period of five years after the Termination Date, Hardy shall "not compete directly or indirectly with the products or services" which were offered by TEC during the term of his employment, and that he is prohibited from using at any time for any reason any "proprietary and confidential information" of TEC to which he had access during his employment by TEC. Hardy hereby acknowledges and reaffirms such obligations.

(b)    Covenant Not to Compete. As additional consideration for the benefits to be paid to Hardy by TEC under this Agreement, Hardy agrees, in addition to his obligations referenced in Section 12(a) above, that he will not, without the prior, written consent of TEC: (1) induce or attempt to induce any customer of or supplier to TEC to cease or reduce its business or other relationship with TEC or any of its Affiliates, or otherwise interfere with the relationship between TEC or any of its Affiliates and any such person, entity or organization; (ii) engage, directly or indirectly, in any activity with any current customer of TEC anywhere in the world that is competitive with the business of TEC; or (iii) engage, directly or indirectly, in any activity anywhere in the world that is competitive with the business of TEC. For purposes of this Agreement, "engage" shall mean having any direct or indirect interest in any person, entity or organization, whether as an owner, stockholder, partner, member, joint venturer, creditor, director, officer, employee, consultant, independent contractor or otherwise, or rendering any direct or indirect service or assistance to any person, entity or organization (whether as an agent, consultant, or otherwise). Provided, however, the mere, passive ownership by Hardy of 10% or less of a publically traded corporation shall not, in itself, constitute a violation of the provisions of this Section 12(b). The provisions of this Section 12(b) shall remain in effect for a period of five years after the Termination Date.

(c)    Covenant of Non-Solicitation. As additional consideration for the benefits to be paid to Hardy by TEC under this Agreement, Hardy agrees, in addition to his obligations referenced in Sections 12(a) and 12(b) above, that he shall not directly or indirectly: (i) take any action to solicit or divert any business (or potential business) or clients or customers (or potential clients or potential customers) away from TEC; (ii) induce customers, potential customers, clients, potential clients, suppliers, agents or other persons under contract or otherwise associated or doing business with TEC, to reduce or alter any such association or business with or from TEC; or (iii) induce any person in the employment of TEC or any consultant to TEC to (A) terminate such employment or consulting arrangement, (B) accept employment or enter into any consulting arrangement with anyone other than TEC, or (C) interfere with the customers, suppliers, or the clients of TEC in any manner or the business of TEC in any manner. For purposes of this Agreement, a "potential client" or a "potential customer" shall mean a person or entity that TEC: (i) is or will be in the reasonably foreseeable future soliciting or considering soliciting (or has targeted for solicitation, or will be so targeting in the reasonably foreseeable future); or (ii) has, at any time or from time to time been soliciting for or in respect of any current, actively pending or contemplated product lines, businesses or services offered by TEC. Also for purposes of this Agreement, "potential business" shall mean any current or reasonably foreseeable commercial activity or any current or reasonably foreseeable commercial opportunities associated in any way with

6

TEC. The provisions of this Section 12(c) shall remain in effect for a period of five years after the Termination Date.

(d)    Covenant of Non-Disparagement.    Hardy agrees that he shall make no negative statements or communications disparaging TEC or its officers, directors, shareholders, agents, businesses, products, or services to any third party.

(e)    Injunctive Relief. Hardy acknowledges and agrees that the provisions of this Section 12 form an integral and material portion of the consideration given by Hardy in exchange for TEC's execution of this Agreement, and that the provisions of this Section 12 are reasonable in nature and scope in every respect. Hardy acknowledges that a violation of this Section 12 would cause immediate and irreparable harm to TEC, and that damages for such harm would be difficult to calculate. As a result, Hardy agrees that TEC may seek an injunction, temporary, permanent or otherwise, restraining order or such other equitable relief as may be available to prevent or restrain Hardy's breach of this Section 12, without the necessity of showing actual damages or posting a bond or other security.

13.    **Release of TEC by Hardy**.

(a)    Release. Hardy (for Hardy, Hardy's heirs, permitted assigns and executors) does hereby release and forever discharge TEC, its Affiliates, and all past and present employees, managers, owners, shareholders, directors, officers, successors, assigns, insurers, and attorneys of TEC and its Affiliates (the "Released Parties") from any and all claims, suits, demands, causes of action, contracts, covenants, obligations, debts, costs, expenses, attorneys' fees, liabilities of whatever kind or nature in law or equity, by statute or otherwise, whether now known or unknown, vested or contingent, suspected or unsuspected, and whether or not concealed or hidden, which have existed or may have existed, or which do exist, through the Effective Date (collectively, "Claims"), of any kind, which relate in any way to Hardy's involvement with TEC and any transaction to which it was a party, Hardy's employment with TEC, or the termination of that employment, except those arising out of the performance of this Agreement. Such released Claims include, without in any way limiting the generality of the foregoing language, any and all claims, liabilities or causes of action including, but not limited to, any rights or claims under the Age Discrimination in Employment Act of 1967; Title VII of the Civil Rights Act of 1964, as amended; the Tennessee Human Rights Act; the Tennessee Handicap Act; the Tennessee Public Protection Act; the Tennessee Workers' Compensation Act; the Employee Retirement Income Security Act; the Americans with Disabilities Act; the Family and Medical Leave Act; the Fair Labor Standards Act; any and all other federal or state laws relating to employment, compensation, discrimination, retaliation, violation of public policy, whistleblower claims, constitutional claims, all claims for tortious discharge, defamation, libel or slander; assault or battery; breach of any alleged employment contract; negligent or intentional infliction of emotional distress; invasion of privacy; or any other claims or causes of action arising out of Hardy's employment with TEC or Hardy's termination therefrom. Hardy further acknowledges and agrees that Hardy does not, to Hardy's knowledge, have any workers' compensation or potential workers' compensation claims against TEC. Hardy does not waive rights or claims that exist based on TEC's obligations under this Agreement or under COBRA, or rights or claims that may arise and are based entirely on acts or omissions that occur after the date this Agreement is executed.

7

(b)     Further Covenants. In signing this release, Hardy acknowledges that this release is intended to be effective as a bar to each and every one of the Claims hereinabove mentioned or implied. Hardy expressly consents that this release shall be given full force and effect according to each and all of its express terms and provisions, including those relating to unknown and unsuspected Claims (notwithstanding any statute that expressly limits the effectiveness of a general release of unknown, unsuspected and unanticipated Claims), if any, as well as those relating to any other Claims hereinabove mentioned or implied. Hardy acknowledges and agrees that this release is an essential and material term of this Agreement and without such release, TEC would not have made available to Hardy the benefits provided for herein. Hardy covenants not to sue or to institute or cause to be instituted any action, claim, charge, or proceeding in any federal, state, or local agency or court with respect to any Claim against the Released Parties. In the event of a breach of this covenant, the Released Parties, together with such other relief to which the Released Party may be entitled, shall have actual attorneys' fees and other expenses incurred in defense thereof paid by Hardy. Hardy further agrees that in the event Hardy brings any Claim seeking damages against the Released Parties, this release shall serve as a complete defense to such Claims.

14.     **Release of Hardy by TEC**. TEC hereby releases and discharges Hardy and his heirs, executors and assigns from all actions, causes of action, claims, demands, and expenses of whatever nature arising from its relationship of any nature with Hardy, except for Hardy's obligations to TEC created and/or retained pursuant to the terms of this Agreement, and except with respect to any claims arising from and/or derivative of any criminal conduct or fraud.

15.     **Non-Waiver**. The failure by either party to exercise any of its or his rights in the event of a breach of this Agreement by the other party shall not be construed as a waiver of such breach or any subsequent breach, or prevent either party from later enforcing strict compliance with this Agreement as to such breach or any subsequent breach.

16.     **Future Claims**. Notwithstanding any provisions of this Agreement, no term or provision hereof is to be construed as waiving or releasing any prospective claim based upon acts, omissions, or events occurring after the Effective Date of this Agreement.

17.     **Successors and Assigns**. This Agreement shall be binding upon and inure to the benefit of TEC and its successors and assigns. TEC shall require any successor to all or substantially all of the business and/or assets of TEC, whether direct or indirect, by purchase, merger, consolidation, acqution of stock, or otherwise, to expressly assume and agree to perform this Agreement in the same manner and to the same extent as TEC would be required to perform if no such succession had taken place. This Agreement shall not be assignable by Hardy under any circumstances, but in the event of Hardy's death any accrued but unpaid amounts owing to Hardy shall be paid to Hardy's Estate.

18.     **Knowing and Voluntary Agreement**. By signing this Agreement, Hardy agrees that this Agreement is signed and delivered by Hardy as Hardy's knowing and voluntary act after being encouraged to review this Agreement as set forth more specifically in Section 19 below.

19.     **Right of Revocation. Hardy acknowledges that Hardy has been offered a**

8

period of twenty-one (21) days in which to consider entering into this Agreement and has been advised in writing by TEC to seek legal advice prior to entering into this Agreement. As evidenced by Hardy's signature below, Hardy acknowledges that Hardy has read and reviewed this Agreement and now knowingly and voluntarily, without coercion, agrees to and understands the significance and consequences of its terms. Following the date of execution of this Agreement by Hardy, Hardy shall have seven (7) days in which to revoke this Agreement. If Hardy timely exercises the right to revoke, this Agreement shall become null and void and TEC shall not make any payments to, or extend any benefits to, Hardy as contemplated under this Agreement. Should Hardy not exercise the right to revoke this Agreement within seven (7) days from its date of execution, this Agreement shall become effective and each party shall be obligated to comply with the requirements stated herein. Hardy acknowledges that TEC shall have no obligation to make any payments to Hardy contemplated in this Agreement or to take any other actions hereunder during the seven (7) day period immediately following execution of this Agreement. Neither Hardy's failure to execute this Agreement nor Hardy's revocation of this Agreement after execution shall affect or prevent the termination of Hardy's employment, which will become effective on the Effective Date.

20.   **Entire Agreement.** This Agreement constitutes the final and entire agreement between the parties and supersedes any prior agreements, written or oral, between the parties regarding the subject matter hereof. Except as specifically referenced in Section 22 below, herein, there are no other, agreements between them, written or oral. None of the parties hereto have made any representation, warranty, or covenant not contained in this Agreement. Further, no amendment, modification, or waiver of, or supplement to, this Agreement shall be effective unless it is in writing and signed by each party. The agreements made herein may not be modified, supplemented, or changed in whole or in part by any waiver (other than a written waiver signed by the parties), oral representation, or course of dealing.

21.   **Governing Law.** This Agreement shall be governed by the laws of the State of Tennessee, without regarding for any conflict of law principles, and any legal proceeding arising out of or in connection with this Agreement shall be brought in a court with subject matter jurisdiction located in Knox County, Tennessee.   Each party irrevocably and unconditionally consents to the service of any process, pleadings, notices or other papers in connection with any such proceeding and to submit to personal jurisdiction in such venue.

22.   **No Effect on Other, Independent Agreements.** Nothing contained in this Agreement is intended to, nor shall have the effect of modifying, terminating, or affecting in any manner any written agreement between TEC and Hardy, if any, existing prior to the effective date of this Agreement, unless expressly stated by this Agreement.

23.   **Confidentiality.**   TEC and Hardy shall not disclose the terms of this Agreement, except by applicable court order, or by prior written consent of the other party, or to their attorneys, accountants, agents (and in TEC's case, its employees) with legitimate need to know its contents, with instructions to such individuals to maintain and respect the confidentiality of the Agreement.

24.   **Severability.**   If any provision of this Agreement is held to be unenforceable, TEC may elect to enforce the remainder of the Agreement or cancel it and recover any consideration paid in connection with the unenforceable provision.

25.   **Notices**.  All notices, demands, requests, or other communications which may be or are required to be given or made by any party to any other party pursuant to this Agreement shall be in writing and shall be hand delivered, mailed by first-class registered or certified mail, return receipt requested, postage prepaid, delivered by overnight air courier, or transmitted by facsimile or email transmission (but only if such telefax or email is actually received) addressed as follows:

      (a)    If to TEC:

           TEC
           10737 Lexington Drive
           Knoxville, Tennessee 37932-3294
           Attn:  William M. Simpkins, President and CEO
           Telefax: 865-675-1241
           Email:  Buddy.Simpkins@tec-usa.com

           with copy to:

           James S. Tipton, Jr.
           Gentry, Tipton & McLemore, P.C.
           P.O. Box 1990
           Knoxville, Tennessee 37901
           Telefax:  865-523-7315
           Email:  jst@tennlaw.com

      (b)    If to Hardy:

           Dr. William Hardy
           565 Glen Abbey Boulevard
           Knoxville, Tennessee 37922
           Email:  whardy@charter.net

           with copy to:

           Chad Hatmaker
           Woolf, McClane, Bright, Allen & Carpenter
           900 S. Gay Street
           Knoxville, TN 37902
           Telefax:  865-215-1015
           Email:  chatmaker@wmbac.com

Each party may designate by notice in writing a new address to which any notice, demand, request or communication may thereafter be so given, served or sent.  Each notice, demand, request, or communication that shall be given or made in the manner

10

described above shall be deemed sufficiently given or made for all purposes at such time as it is delivered to the addressee (with the return receipt, the delivery receipt, confirmation of facsimile transmission or the affidavit of messenger being deemed conclusive but not exclusive evidence of such delivery) or at such time as delivery is refused by the addressee upon presentation.

26.    **No Admission**.  TEC and Hardy agree that nothing in this Agreement is an admission by either party of any wrongdoing, and that nothing in this Agreement is to be construed as such by any person.

27.    **Miscellaneous**.

(a)    Counterparts.  This Agreement may be executed in several counterparts, and it shall not be necessary that the signatures of all parties be contained on any one counterpart hereof; each of which shall be an original and all of which together shall constitute but one and the same Agreement.

(b)    Headings.  The various titles of the sections herein are used solely for convenience and shall not be used for interpreting or construing any word, clause, section, paragraph, or subparagraph of this Agreement.

(c)    Attorney's Fees.  In any action involving any dispute regarding this Agreement, the prevailing party shall be entitled to recover its reasonable costs of collection, including reasonable attorney's fees.

(d)    No Presumption Regarding Draftsmanship.  This Agreement shall be deemed to have been jointly prepared by the parties, and no rule of construction to the contrary shall be applied.

(e)    Additional Documents.  TEC and Hardy agree to provide, upon reasonable request of the other party, any additional documents necessary or advisable to fully document and/or accomplish the intentions and purposes of this Agreement.

(f)    Hardy's Website.  Hardy is currently maintaining a website, www.themeterman.com.  Hardy hereby transfers ownership of such site to TEC, and after the Effective Date will make no further use thereof.

(g)    Cellular Telephone, 865-414-4889.  Within five (5) days of the Effective Date, Hardy shall deliver to TEC his cellular telephone and a list of all business contact numbers in the phone's directory as of the Termination Date.  At his election, Hardy may arrange for the transfer of the assigned number, 865-414-4889 to his personal account, within five (5) days of the Effective Date.  If Hardy elects to transfer such number, TEC will provide such reasonable documentation as may be required for the transfer.  Hardy acknowledges that all applicable provisions of this Agreement shall apply to his use of such phone number, and affirmatively agrees to promptly refer to TEC all calls relating to TEC or TEC's business.

11

IN WITNESS WHEREOF, the parties have caused this document to be executed as of the Effective Date.

TECHNOLOGY FOR ENERGY CORPORATION

By: _____

William M. Simpkins, President and CEO

Date of Execution: _____ 5/24/2012 _____

**WILLIAM H. HARDY**

_____

Date of Execution: _____ May 18 2012 _____

*JST:mlw/A-Severance and Release Agreement Hardy Retirement (D)*

12

# CONSULTING CONTRACT

THIS SUBCONTRACT, entered into this _____ day of _____, by and between Technology for Energy Corporation, a corporation duly organized and existing under the laws of the State of Tennessee, with offices located in Knox County, Tennessee (hereinafter called the "Company"), and _____ (hereinafter called the "Consultant");

WHEREAS the Company from time to time has the need to obtain the specialized services of the Consultant; and

WHEREAS the Consultant is willing to perform said services in accordance with the provisions of this Contract;

NOW THEREFORE, the parties do mutually agree as follows:

## ARTICLE I - PERIOD OF PERFORMANCE

This Consultant shall commence work on _____ and continue in effect until _____, unless terminated in accordance with Article X.

## ARTICLE II - SCOPE OF WORK

At the request of the Company, Consultant shall render such service as required by the Company at such times and places as are mutually agreed upon by the Company and Consultant.

## ARTICLE III - CONSIDERATION

In consideration for this Contract and all services performed hereunder, the Company shall pay the Consultant:

(A) At the rate of _____ per _____ for such time as Consultant actually performs services hereunder.

(B) In connection with authorized travel status, sums sufficient to reimburse Consultant for the actual cost of transportation and lodging and other expenses in strict accordance with the Company's travel policies in force at the time of such authorized travel.

The term "authorized travel status" as used in this Contract shall be deemed to mean time spent away from Consultant's usual base in connection with the services called for hereunder, but no allowance for transportation, lodging or per diem shall be payable for travel within the Consultant's usual base of operations. All authorized travel status shall be subject to the approval of the Company.



EXHIBIT ___A_____

-1-

## ARTICLE IV - PAYMENT

Consultant shall be paid monthly for services rendered, upon submission of an invoice on the Company's form, the consideration stipulated herein. Payment for travel expenses will be made in accordance with the Company's travel policy.

## ARTICLE V - DRAWINGS, SKETCHES, MEMORANDA, ETC.

All drawings, sketches, designs, design data, specifications, notebooks, technical and scientific data, and all photographs, negatives, reports, findings, recommendations, data and memoranda of every description relating thereto, as well as all copies of the foregoing relating to the work or any part thereof, shall be subject to inspection by the Company and shall be the property of the Company and may be used by the Company for any purpose whatsoever without any claim on the part of the Consultant for additional compensation, and shall, subject to the right of the Consultant to retain a copy of said material for his use, be delivered to the Company, or otherwise disposed of by the Consultant as the Company may from time to time direct during the progress of the work or in any event as the Company shall direct upon completion or termination of this Contract. The Consultant's right of retention and use shall be subject to the provisions of Articles VI, VII, VIII, and IX of this Contract.

## ARTICLE VI - PROPRIETARY INFORMATION

The Consultant recognizes and acknowledges that the trade secrets, formulas, methods, inventions and devices developed or used by the Company and all such future trade secrets, etc., that may be developed or used by the Company in the operation of the business of the Company constitute a valuable, special and unique asset of the Company. The Consultant will not, as a Consultant or thereafter, without permission of the Company, disclose such trade secrets, etc., to any person, firm, corporation, association or other entity for any reason or purpose whatsoever. In the event of a breach or threatened breach by the Consultant of the provisions of this paragraph, the Company shall be entitled to an injunction restraining the Consultant from so doing. Nothing herein shall be construed as prohibiting the Company from pursuing any other remedies available to the Company for such breach or threatened breach.

## ARTICLE VII - COPYRIGHT

A. Consultant (i) agrees that the Company shall determine the disposition of the title to and the rights under the copyright secured by the Consultant on copyrightable material first produced or composed under this Contract and (ii) hereby grants to the Company a royalty-free, non-exclusive, irrevocable license to reproduce, translate, publish, use and dispose of, and to authorize others so to do, all copyrighted and copyright- able work not first produced or composed by the Consultant in the performance of this Contract but which is incorporated in the material furnished under the Contract, provided that such license shall be only to the extent the Consultant now has, or prior to the completion or final settlement of the Contract may acquire, the right to grant such license without becoming liable to pay compensation to others solely because of such grant.

-2-

B. The Consultant agrees that he will not include any copyrighted material in any written or copyrightable material furnished or delivered under this Contract without a license as provided for in Paragraph A.(ii) hereof, or without the consent of the copyright owner, unless specific written approval of the Company to the inclusion of such copyrighted material is secured.

C. The Consultant agrees to report in writing to the Company, promptly and in reasonable detail, any notice of claim of copyright infringement received by the Consultant with respect to any material delivered under this Contract.

## ARTICLE VIII - PATENTS

Whenever any invention or discovery is made or conceived by the Consultant in the course of or under this Contract, Consultant shall promptly furnish the Company with complete information thereon; and the Company shall have the sole power to determine whether or not and where a patent application shall be filed, and to determine the disposition of the title to and rights in and to any invention or discovery and any patent that may result. The Consultant agrees that he will execute all documents and do all things necessary or proper to carry out the judgement of the Company.

## ARTICLE IX - GOVERNMENT SUBCONTRACTS

Certain services provided by the Consultant may be in support of the Company's work under a Government subcontract which may impose additional conditions on the Consultant and the Company as regards, but not limited to Security and Classification, Copyrights, Patents, Travel and under such circumstance the parties hereto agree that Government subcontract provision will take precedence over any portions of this Contract where conflict between the Government subcontract and this Contract may occur and will apply with respect to any provisions not specifically set forth in this Contract.

## ARTICLE X - TERMINATION

Either party thereto may terminate this Contract at any time by giving not less than thirty (30) days prior written notice to the other party. Such termination shall only affect the term of this Contract, and shall otherwise be without prejudice to the rights of the parties hereunder.

## ARTICLE XI - MISCELLANEOUS PROVISIONS

A. The waiver by the Company of a breach of any provision of this agreement by the Consultant shall not operate or be construed as waiver of any subsequent breach by the Consultant.

B. The rights and obligations of the Company under this agreement shall enure to the benefit of and shall be binding upon the successors and assigns of the Company.

C. This agreement may be extended or amended by agreement of the parties in writing at any time or times.

D. The invalidity or unenforceability of any provision hereof shall in no way effect the validity of enforceability of any other provision.

E. This agreement shall be governed by the laws of the State of Tennessee.

-3-

F. This agreement is executed in duplicate, the executed counterpart shall have the same force and legal effect as the executed original.

G. In performance of work under this Contract, Consultant agrees to comply with all safety and health regulations prescribed by the Company.

## ARTICLE XII - ENTIRE AGREEMENT

It is expressly agreed by the parties hereto that this Contract constitutes the entire and only Contract between the parties hereto; that there are no agreements, understandings or covenants between the parties hereto of any kind, nature, or description, express or implied, oral or otherwise, which have not been set forth herein; and that, except as expressly provided herein, this Contract cannot be modified, altered, amended, changed or cancelled, not any provision thereof waived or abrogated, except by an instrument in writing and duly executed by the Consultant and the duly authorized representative of the Company.

IN WITNESS WHEREOF, the parties hereto have executed this Contract as of the day and year first above written.

ACCEPTED:                                  TECHNOLOGY FOR ENERGY CORPORATION

By: _____        By:
       Consultant                                    Ronald D. Brenner

                                                        President and CEO

-4-

# EXHIBIT 2

EMPLOYEE AGREEMENT

Technology for Energy Corporation (TEC) uses commercially valuable technical and non-technical information either developed by TEC employees or supplied by third parties under legal agreement. In order to guard the interests of TEC and the rights of others, it is necessary to protect certain of the information either by patent, copyright, trademark or by trade secret. Each employee, through his or her activities on behalf of TEC, may become acquainted with or contribute to such information.

Therefore, as part of his or her responsibility as a TEC employee, the undersigned agrees as follows:

1.  a)  I agree that I will promptly communicate to TEC all inventions, discoveries, and improvements made or conceived or reduced to practice by me, solely or jointly with others during the term of my employment.

    b)  I hereby assign to TEC or its nominees all my rights to such inventions, discoveries and improvements that are within the scope of actual or anticipated business, products, services or projects of TEC as defined and limited by the TEC Charter.

    c)  I will assist TEC and its nominees, without charge but entirely at their expense, during my employment and after, to obtain patents for these inventions, discoveries, and improvements in any and all countries.

    d)  I will execute all papers and help in any reasonable way to maintain the rights of TEC in these matters.

2.  a)  I agree that all my writings in the performance of my work at TEC are the property of TEC and that TEC has the sole and exclusive right to copyright such writings anywhere.

    b)  I further agree that I will not, without written authorization from TEC, make any copies of such writings, or use or allow others to use such writings, or copies, except as reasonably required or advantageous for the performance of my work at TEC.

3.  a)  I will not, during my employment by TEC or thereafter without TEC's written approval, disclose to others nor use for my own benefit or the future benefit of any other individual or firm, data and information which is not generally known, which relates to my work or which relates to the actual or anticipated business, products, services or projects of TEC or similar data and information of other individuals or organizations to which I may gain access in the course of my employment of by reason of such employment.

    b)  I will promptly surrender to TEC all record bearing media containing or comprising such data and information upon termination of my employment.

4.  I agree that, except as may be noted on the attached External Activity Disclosure Form, there are no inventions or information which I deem to be excluded from the scope of the agreement.

5.  I agree that, except as may be noted on the attached External Activity Disclosure Form, I have no agreement with any other party that would preclude my compliance with my obligation under this agreement.

_William N. Hardy_ show to Buddy    _Dec 8  2003_
Signature                              Date

# EXHIBIT 3

## TECHNOLOGY FOR ENERGY CORPORATION

## STOCK OPTION AWARD AGREEMENT

THIS STOCK OPTION AWARD AGREEMENT (the "Agreement") made effective as of _Apr l   3rd_____, 2007, by and between **Technology For Energy Corporation**, a Tennessee corporation (the "Company"), and **William H. Hardy** (the "Option Holder").

WHEREAS, Section 7 of the Company's Stock Option Plan (the "Plan") authorizes the Board of Directors (the "Board") to award stock options to eligible participants in the Plan;

WHEREAS, the Option Holder is an employee of the Company and an eligible participant in the Plan;

WHEREAS, under Section 7(c) of the Plan, a participant receiving stock options shall enter into an Option Agreement with the Company, setting forth the conditions of the grant of stock options; and

WHEREAS, the Committee has awarded the Option Holder the stock options set forth below;

NOW, THEREFORE, the Company and the Option Holder hereby, for mutual and valuable consideration the receipt of which is hereby acknowledged, enter into this Agreement:

1.      **Grant of Option.**  Subject to the terms and conditions of the Company's Plan, a copy of which is incorporated by reference and made a part of this Agreement, the Company hereby grants to the Option Holder effective as of _April 3_____, 2007 (the "Date of Grant"), an option (the "Option") to purchase ten thousand (10,000) shares of the Class B common stock of the Company ("Class B Common Stock") at a price per share of twenty-one dollars ($21.00) (the "Option Price").  The Option Price is no less than one hundred percent (100%) of the fair market value per share of the Class B Common Stock on the Date of Grant.

2.      **Option Period and Vesting.**  The Option Holder shall vest in the Option over a five-year period commencing on the Date of Grant.  Twenty percent (20%) of the Option shall vest twelve (12) months after the Date of the Grant, and the remaining eighty percent (80%) shall vest in equal annual installments of an additional twenty percent (20%) per year over the following four (4) years.

3.      **Method for Exercising the Option.**  The Option may not be exercised earlier than six (6) months from the Date of Grant.  The vested portion of the Option may be exercised in whole or in part only by delivery in person or through certified or registered mail to the Company at its principal office (attention: President) of written notice specifying the Option that is being exercised and the number of shares of Class B Common Stock with respect to which the Option is being exercised.  The notice must be accompanied by payment of the Option Price for the portion of the Option being exercised.  Payment of this portion of the Option Price for the

Class B Common Stock shall be made in full by any of the following methods or any combination of the following methods:

        (a)    In cash or by certified or cashier's check payable to Technology For Energy Corporation; or

        (b)    The delivery to the Company of certificates representing the number of shares of Class B Common Stock then owned by the Option Holder, the Fair Market Value (defined below) of which equals the Option Price of the Class B Common Stock purchased pursuant to the Option, properly endorsed for transfer to the Company. (For purposes of this Agreement, the Fair Market Value of any shares of Class B Common Stock delivered in payment of the Option Price upon exercise of the Option shall be the Fair Market Value as of the exercise date, and the exercise date shall be the day of delivery of the certificates for the Class B Common Stock used as payment of the Option Price).

        Upon such notice to the President and payment in full of the amount of the Option Price being exercised, the exercise of the Option shall be deemed to be effective, and a properly executed certificate or certificates representing the Class B Common Stock so purchased shall be issued by the Company and delivered to the Option Holder or the agent designated by the Option Holder.

        For purposes of this Agreement, the "Fair Market Value" of the shares of Class B Common Stock on a given date shall be determined in the same manner that fair market value is determined pursuant to Section 2(i) of the Plan.

        Notwithstanding anything contained herein to the contrary, this Option shall not be exercisable while there is any outstanding incentive stock option which granted to the Option Holder by the Company or a parent or subsidiary of the Company.

    **4.**    **Adjustments.**    In the event of an adjustment (as set forth in Section 8 of the Plan), the Board, in its discretion, shall act to effect one or more of the alternatives set forth in Section 8 of the Plan.

    **5.**    **Expiration and Termination of the Option.**    The Option shall expire at 5:00 p.m. Knoxville, Tennessee time on _Apr 3_____, 2013 (the period from the date of this Agreement to the expiration date is defined as the "Option Period"), or prior to such time as follows:

        (a)    Upon termination of employment of the Option Holder for any reason other than death, retirement, or disability (as defined in Section 105(d)(4) of the Internal Revenue Code), the Options exercisable as of the date of termination may be exercised by Option Holder on the date of the termination of the employment of the Option Holder. Any remaining unexercised Options shall thereafter terminate.

        (b)    Upon termination of employment of the Option Holder by reason of the death or disability (as defined in Section 105(d)(4) of the Internal Revenue Code) of the Option Holder, the Options exercisable as of the date of termination may be exercised by

2

the Option Holder or by the personal representative or administrator of the estate of the deceased Option Holder, within twelve (12) months of the date of termination. Any remaining unexercised Options shall thereafter terminate.

(c)     Upon termination of employment or directorship of the Option Holder by reason of retirement of the Option Holder, the Options exercisable as of the date of termination may be exercised by the Option Holder within ninety (90) days of the date of termination. Any remaining unexercised Options shall thereafter terminate.

6.     **Transferability.**  The Option may not be transferred, assigned, pledged, or alienated by the Option Holder, and it shall be exercisable during the Option Holder's life only by him, and after his death, only by the personal representative or administrator of the estate of the deceased Option Holder.

7.     **Compliance with Securities Laws.**  Upon the acquisition of any shares of Class B Common Stock pursuant to the exercise of the Option herein granted, the Option Holder or any person acting under Section 5(b) of this Agreement will enter into such written representations, warranties and agreements as the Company may reasonably request in order to comply with applicable securities laws or with this Agreement.

8.     **Legends on Certificates.**  The Certificates representing the shares of Class B Common Stock purchased by exercise of an Option will be stamped or otherwise imprinted with legends in such form as the Company or its counsel may require with respect to any applicable restrictions on sale or transfer and the stock transfer records of the Company will reflect stock-transfer instructions with respect to such shares.

9.     **Withholding.**

(a)     <u>Arrangement for Withholding</u>.  The Option Holder hereby agrees to make appropriate arrangements with the Company to provide for the amount of additional tax withholding under Sections 3102 and 3402 of the Internal Revenue Code and applicable state income tax laws, if any, resulting from the exercise of the Option.  If such arrangements are not made, the Company may refuse to issue any Class B Common Stock to the Option Holder.

(b)     <u>Withholding Election</u>.  The Option Holder may elect to pay all such amounts of tax withholding, or any part thereof, by electing to transfer to the Company, or to have the Company withhold from shares otherwise issuable to the Option Holder, shares of Class B Common Stock having a value equal to the amount required to be withheld or such lesser amount as may be elected by the Option Holder provided that all such elections shall be subject to the approval or disapproval of the Board.  The value of shares of Class B Common Stock to be withheld shall be based on the Fair Market Value of the Class B Common Stock on the date that the amount of tax to be withheld is to be determined.

10.     **Acknowledgment of Option Holder.**  The Option Holder acknowledges having received and read a copy of the Plan and this Agreement and agrees to comply with all laws,

3

rules and regulations applicable to the grant and exercise of the Option and the sale or other disposition of the Class B Common Stock.

**11.    Non-Compete Covenant.**    The Option Holder agrees that in consideration of receiving this Option that the Option Holder will not compete directly or indirectly compete with the products or services offered by the Company while employed and for a period of five (5) years after termination of employment.  The Option Holder further agrees that while employed by the Company the Option Holder had access to proprietary and confidential information that may not be used for any reason after termination of employment.

**12.    Miscellaneous.**

(a)    <u>Notices</u>.    Any notice required or permitted to be given under this Agreement shall be in writing and shall be given by first class registered or certified mail, postage prepaid, or by personal delivery to the appropriate party, addressed:

(i)    If to the Company, to the Company at its principal place of business (Attention:   President) or at such other address as may have been furnished to the Option Holder in writing by the Company; or

(ii)    If to the Option Holder, to the Option Holder at his address on file with the Company, or at such other address as may have been furnished to the Company by the Option Holder.

Any such notice shall be deemed to have been given as of the fourth day after deposit in the United States Postal Service, postage prepaid, properly addressed as set forth above, in the case of mailed notice, or as of the date delivered in the case of personal delivery.

(b)    <u>Amendment</u>.    The Board of Directors may make any adjustment in the Option Price, the number of shares of Class B Common Stock subject to, or the terms of the Option by amendment or by substitution of an outstanding Option.  Such amendment or substitution may result in terms and conditions (including Option Price, the number of shares of Class B Common Stock covered, Vesting Schedule or Option Period) that differ from the terms and conditions of this Option.  Except as expressly permitted pursuant to Section 9 of the Plan, the Board of Directors may not adversely affect the rights of the Option Holder without the consent of the Option Holder.  If such action is effective by amendment, the effective date of such amendment will be the date of the Date of Grant.  Except as provided herein, this Agreement may not be amended or otherwise modified unless evidenced in writing and signed by the Company and the Option Holder.

(c)    <u>Severability</u>.    The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, and each other provision of this Agreement shall be severable and enforceable to the extent permitted by law.

(d)    <u>Waiver</u>.    Any provision contained in this Agreement may be waived, either generally or in any particular instance, by the Company.

4

(e)    <u>Binding Effect</u>.  This Agreement shall be binding upon and inure to the benefit of the Company and the Option Holder and their respective heirs, executors, administrators, legal representatives, successors and assigns.

(f)    <u>Rights to Employment</u>.  Nothing contained in this Agreement shall be construed as giving the Option Holder any right to be retained in the employ or service of the Company and this Agreement is limited solely to governing the rights and obligations of the Option Holder with respect to the Class B Common Stock and the Option.

(g)    <u>Gender and Number</u>.  Except when otherwise indicated by the context, the masculine gender shall also include the feminine gender, and the definition of any term herein in the singular shall also include the plural.

(h)    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Tennessee.

**IN WITNESS WHEREOF**, the parties have executed this Agreement on the date set forth below.

**TECHNOLOGY FOR ENERGY CORPORATION**

By: _____

William M. Simpkins, President

**OPTION HOLDER**

_____

William H. Hardy

*TMR/elb:Corporate/Technology For Energy/Stock Option Award Agmt v2*

5

# EXHIBIT 4

# TECHNOLOGY FOR ENERGY CORPORATION

## STOCK OPTION AWARD AGREEMENT

THIS STOCK OPTION AWARD AGREEMENT (the "Agreement") made effective as of April 29, 2011, by and between **Technology For Energy Corporation**, a Tennessee corporation (the "Company"), and **William H. Hardy** (the "Option Holder").

WHEREAS, Section 7 of the Company's Stock Option Plan (the "Plan") authorizes the Board of Directors (the "Board") to award stock options to eligible participants in the Plan;

WHEREAS, the Option Holder is an employee of the Company and an eligible participant in the Plan;

WHEREAS, under Section 7(c) of the Plan, a participant receiving stock options shall enter into an Option Agreement with the Company, setting forth the conditions of the grant of stock options; and

WHEREAS, the Committee has awarded the Option Holder the stock options set forth below;

NOW, THEREFORE, the Company and the Option Holder hereby, for mutual and valuable consideration the receipt of which is hereby acknowledged, enter into this Agreement:

1.      **Grant of Option.**  Subject to the terms and conditions of the Company's Plan, a copy of which is incorporated by reference and made a part of this Agreement, the Company hereby grants to the Option Holder effective as of April 29, 2011 (the "Date of Grant"), an option (the "Option") to purchase twenty thousand (20,000) shares of the Class B common stock of the Company ("Class B Common Stock") at a price per share of twenty-four dollars and no cents ($24.00) (the "Option Price").  The Option Price is no less than one hundred percent (100%) of the fair market value per share of the Class B Common Stock on the Date of Grant.

2.      **Option Period and Vesting.**  The Option Holder shall vest in the Option over a five-year period commencing on the Date of Grant.  Twenty percent (20%) of the Option shall vest twelve (12) months after the Date of the Grant, and the remaining eighty percent (80%) shall vest in equal annual installments of an additional twenty percent (20%) per year over the following four (4) years.

3.      **Method for Exercising the Option.**  The Option may not be exercised earlier than six (6) months from the Date of Grant.  The vested portion of the Option may be exercised in whole or in part only by delivery in person or through certified or registered mail to the Company at its principal office (attention: President) of written notice specifying the Option that is being exercised and the number of shares of Class B Common Stock with respect to which the Option is being exercised.  The notice must be accompanied by payment of the Option Price for the portion of the Option being exercised.  Payment of this portion of the Option Price for the

Class B Common Stock shall be made in full by any of the following methods or any combination of the following methods:

> (a) In cash or by certified or cashier's check payable to Technology For Energy Corporation; or

> (b) The delivery to the Company of certificates representing the number of shares of Class B Common Stock then owned by the Option Holder, the Fair Market Value (defined below) of which equals the Option Price of the Class B Common Stock purchased pursuant to the Option, properly endorsed for transfer to the Company. (For purposes of this Agreement, the Fair Market Value of any shares of Class B Common Stock delivered in payment of the Option Price upon exercise of the Option shall be the Fair Market Value as of the exercise date, and the exercise date shall be the day of delivery of the certificates for the Class B Common Stock used as payment of the Option Price).

> Upon such notice to the President and payment in full of the amount of the Option Price being exercised, the exercise of the Option shall be deemed to be effective, and a properly executed certificate or certificates representing the Class B Common Stock so purchased shall be issued by the Company and delivered to the Option Holder or the agent designated by the Option Holder.

> For purposes of this Agreement, the "Fair Market Value" of the shares of Class B Common Stock on a given date shall be determined in the same manner that fair market value is determined pursuant to Section 2(i) of the Plan.

> Notwithstanding anything contained herein to the contrary, this Option shall not be exercisable while there is any outstanding incentive stock option which was granted to the Option Holder by the Company or a parent or subsidiary of the Company.

4. **Adjustments.** In the event of an adjustment (as set forth in Section 8 of the Plan), the Board, in its discretion, shall act to effect one or more of the alternatives set forth in Section 8 of the Plan.

5. **Expiration and Termination of the Option.** The Option shall expire at 5:00 p.m. Knoxville, Tennessee time on April 29th, 2018 (the period from the date of this Agreement to the expiration date is defined as the "Option Period"), or prior to such time as follows:

> (a) Upon termination of employment of the Option Holder for any reason other than death, retirement, or disability (as defined in Section 105(d)(4) of the Internal Revenue Code), the Options exercisable as of the date of termination may be exercised by Option Holder on the date of the termination of the employment of the Option Holder. Any remaining unexercised Options shall thereafter terminate.

> (b) Upon termination of employment of the Option Holder by reason of the death or disability (as defined in Section 105(d)(4) of the Internal Revenue Code) of the Option Holder, the Options exercisable as of the date of termination may be exercised by the Option Holder or by the personal representative or administrator of the estate of the

2

deceased Option Holder, within twelve (12) months of the date of termination. Any remaining unexercised Options shall thereafter terminate.

(c)     Upon termination of employment or directorship of the Option Holder by reason of retirement of the Option Holder, the Options exercisable as of the date of termination may be exercised by the Option Holder within ninety (90) days of the date of termination. Any remaining unexercised Options shall thereafter terminate.

**6.     Transferability.** The Option may not be transferred, assigned, pledged, or alienated by the Option Holder, and it shall be exercisable during the Option Holder's life only by him, and after his death, only by the personal representative or administrator of the estate of the deceased Option Holder.

**7.     Compliance with Securities Laws.** Upon the acquisition of any shares of Class B Common Stock pursuant to the exercise of the Option herein granted, the Option Holder or any person acting under Section 5(b) of this Agreement will enter into such written representations, warranties and agreements as the Company may reasonably request in order to comply with applicable securities laws or with this Agreement.

**8.     Legends on Certificates.** The Certificates representing the shares of Class B Common Stock purchased by exercise of an Option will be stamped or otherwise imprinted with legends in such form as the Company or its counsel may require with respect to any applicable restrictions on sale or transfer and the stock transfer records of the Company will reflect stock-transfer instructions with respect to such shares.

**9.     Withholding.**

(a)     <u>Arrangement for Withholding</u>. The Option Holder hereby agrees to make appropriate arrangements with the Company to provide for the amount of additional tax withholding under Sections 3102 and 3402 of the Internal Revenue Code and applicable state income tax laws, if any, resulting from the exercise of the Option. If such arrangements are not made, the Company may refuse to issue any Class B Common Stock to the Option Holder.

(b)     <u>Withholding Election</u>. The Option Holder may elect to pay all such amounts of tax withholding, or any part thereof, by electing to transfer to the Company, or to have the Company withhold from shares otherwise issuable to the Option Holder, shares of Class B Common Stock having a value equal to the amount required to be withheld or such lesser amount as may be elected by the Option Holder provided that all such elections shall be subject to the approval or disapproval of the Board. The value of shares of Class B Common Stock to be withheld shall be based on the Fair Market Value of the Class B Common Stock on the date that the amount of tax to be withheld is to be determined.

**10.     Acknowledgment of Option Holder.** The Option Holder acknowledges having received and read a copy of the Plan and this Agreement and agrees to comply with all laws, rules and regulations applicable to the grant and exercise of the Option and the sale or other disposition of the Class B Common Stock.

3

**11.     Non-Compete Covenant.**   The Option Holder agrees that in consideration of receiving this Option that the Option Holder will not compete directly or indirectly compete with the products or services offered by the Company while employed and for a period of five (5) years after termination of employment.  The Option Holder further agrees that while employed by the Company the Option Holder had access to proprietary and confidential information that may not be used for any reason after termination of employment.

**12.     Miscellaneous.**

(a)     Notices.   Any notice required or permitted to be given under this Agreement shall be in writing and shall be given by first class registered or certified mail, postage prepaid, or by personal delivery to the appropriate party, addressed:

(i)     If to the Company, to the Company at its principal place of business (Attention:   President) or at such other address as may have been furnished to the Option Holder in writing by the Company; or

(ii)     If to the Option Holder, to the Option Holder at his address on file with the Company, or at such other address as may have been furnished to the Company by the Option Holder.

Any such notice shall be deemed to have been given as of the fourth day after deposit in the United States Postal Service, postage prepaid, properly addressed as set forth above, in the case of mailed notice, or as of the date delivered in the case of personal delivery.

(b)     Amendment.   The Board of Directors may make any adjustment in the Option Price, the number of shares of Class B Common Stock subject to, or the terms of the Option by amendment or by substitution of an outstanding Option.  Such amendment or substitution may result in terms and conditions (including Option Price, the number of shares of Class B Common Stock covered, Vesting Schedule or Option Period) that differ from the terms and conditions of this Option.  Except as expressly permitted pursuant to Section 9 of the Plan, the Board of Directors may not adversely affect the rights of the Option Holder without the consent of the Option Holder.  If such action is effective by amendment, the effective date of such amendment will be the date of the Date of Grant. Except as provided herein, this Agreement may not be amended or otherwise modified unless evidenced in writing and signed by the Company and the Option Holder.

(c)     Severability.   The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, and each other provision of this Agreement shall be severable and enforceable to the extent permitted by law.

(d)     Waiver.   Any provision contained in this Agreement may be waived, either generally or in any particular instance, by the Company.

4

(e)     <u>Binding Effect</u>.  This Agreement shall be binding upon and inure to the benefit of the Company and the Option Holder and their respective heirs, executors, administrators, legal representatives, successors and assigns.

(f)     <u>Rights to Employment</u>.  Nothing contained in this Agreement shall be construed as giving the Option Holder any right to be retained in the employ or service of the Company and this Agreement is limited solely to governing the rights and obligations of the Option Holder with respect to the Class B Common Stock and the Option.

(g)     <u>Gender and Number</u>.  Except when otherwise indicated by the context, the masculine gender shall also include the feminine gender, and the definition of any term herein in the singular shall also include the plural.

(h)     <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Tennessee.

**IN WITNESS WHEREOF**, the parties have executed this Agreement on the date set forth below.

TECHNOLOGY FOR ENERGY CORPORATION

By: _____
William M. Simpkins, President

OPTION HOLDER

_____
William H. Hardy

5

# EXHIBIT 5

**Re: Heard Something**                                                           Sunday, May 5, 2013 8:05 PM

From:    "Ming Cheng" <mingtcheng@yahoo.com>

To:     "Bill Hardy" <bill.hardy@powermeasurements.com>

Bcc:    "Erica Lau" <Erica_yinglau@yahoo.com>

Hi Bill,

Thanks for your head up on new from TEC. I am actively looking. I came back from a trip China and Taiwan.

Best regards

Ming

--- On **Sun, 5/5/13, Bill Hardy** *<bill.hardy@powermeasurements.com>* wrote:

> From: Bill Hardy <bill.hardy@powermeasurements.com>
> Subject: Heard Something
> To: "Ming Cheng" <MingTCheng@yahoo.com>
> Date: Sunday, May 5, 2013, 7:18 PM
>
> Some news on TEC.  Looks like all Divisions are loosing money.  Board meets in two weeks to consider drastic austerity cutbacks.  I think you
> need to find another job ASAP.
>
> Bill
>
> --
> William H Hardy, PhD
> Power Measurements
> 6386 Avington Pl
> Gainesville, VA 20155
> Cell: (865) 279-1090
> Email:  Bill.Hardy@PowerMeasurements.com

# EXHIBIT 6

### Re: Fw: Opportunity

Friday, March 6, 2015 1:27 AM

From: "Bill Hardy" <bill.hardy@powermeasurements.com>

To: "Ming Cheng" <mingtcheng@yahoo.com>

Cc: "paul. qian" <paul.qian@reallin.com>   "catherine" <catherine@reallin.com>

2 Files   3 MB   Download All
PDF  1 MB   DOCX  2 MB

C12..20       C12 1..
Final         Draft 2^
Draft         Oct

Save          Save

First let me describe what Power Measurements is doing.

As Ming may have told you, I have a non-compete agreement with Powermetrix that prevents me from doing anything that competes with them. That agreement lasts through May 2017.

Power Measurements family consists of two companies: Power Measurements LLC located in the US and Power Measurements Inc, located in Cebu, Philippines. In the Philippines we are a PEZA registered company and so operate duty and tax free. We currently have six full time and three part time engineers in Cebu. We have established good relationships with the best local engineering university. We have moved into our office in PEZA zone where we are setting up a calibration lab and prototyping facility.

Our first product will be an Electric Vehicle Charger Testing system. We have been issued a US patent on the device. That is currently being developed in Cebu. All of the parts and PCB assemblies for the first full system prototype should be arriving within the next week. The plan is to manufacture in Cebu also but we plan to subcontract things like the PCB assembly. You might be able to do that for us.

The core technology being developed is very high accuracy power measurement. This technology will be broadly applicable to many things post 2017. Also applicable to very high accuracy meters.

My interest is building Power Measurements into a very significant player in the broad space of power (including metering) and power quality measurement. One of my concerns has been how to bootstrap a significant enough team to take on the big players quickly.

I believe that some sort of joint venture or partnership with a company like Reallin could be the answer. I have the technology and connections in the US market and Reallin has the resources. That could be a win-win for all concerned.

I can create the greatest financial impact if I can concentrate on technical and marketing opportunities and afford to have the infrastructure to run a first class operation.

Between now and 2017 we can concentrate on the EVSE system, ANSI meters, OEM meter modules, sub-metering and ultra-precision meters. After 2017 we can do everything.

I'm attaching a copy of the about to be released new version of ANSI C12.1 and C12.20.  C12.10 is also about to have major changes.

There are many opportunities if we want to pursue them.

Let's try to get communications flowing so we can determine a path for the future.

Best regards,

Bill

William H Hardy, PhD
Power Measurements, LLC
6386 Avington Pl
Gainesville, VA 20155
Phone: (571) 248-7600  (new phone number)
Cell: (865) 279-1090
Email: Bill.Hardy@PowerMeasurements.com

On Fri, Mar 6, 2015 at 12:11 PM, Ming Cheng <mingtcheng@yahoo.com> wrote:
  Hi Catherine.

  Thanks for following up with us. I talked with Dr. Hardy on the skype tonight. I will work with you and paul on this project. I am moving to BJ to live in April and I should have more time to work on our projects with Dr. Hardy and Kerk.

  I will review Dr. Hardy's proposal, and we can have a conversation after to move the project ahead. We will figure out what kind support we need from both sides.

  Thanks

  Ming
  ---------------------------------------
  On Thu, 3/5/15, catherine <catherine@reallin.com> wrote:

    Subject: Re: Fw: Opportunity

Case 2:18-cv-00267-RK   Document 1-1   Filed 01/22/18   Page 72 of 81

To: "paul. qian" <paul.qian@reallin.com>, "Ming Cheng" <mingtcheng@yahoo.com>
Date: Thursday, March 5, 2015, 9:16 PM

#yiv3296483532
body {line-height:1.5;}#yiv3296483532 blockquote
{margin-top:0px;margin-bottom:0px;margin-left:0.5em;}#yiv3296483532
div.yiv3296483532foxdiv20150306101510709551
{margin:10px;}#yiv3296483532 body
{font-size:10.5pt;color:rgb(0, 0,
0);line-height:1.5;}
Dear
Mr. Cheng,
How are
you?Please let me know anything I can arrange in
our side? Thanks.
Best
regards,Catherine  From: paul.qian@reallin.comDate: 2015-03-05 15:56To: catherineSubject: Fw:
Re: Opportunity


paul.qian@reallin.com


From: Bill

Hardy
Date: 2015-03-05 09:28
To: Ming
Cheng
CC: Paul-office
Subject: Re: Opportunity


Can Paul assign a person as lead contact so
we can get things
moving now, rather that wait another couple of months?


Bill


William H Hardy,
PhD
Power Measurements, LLC
6386 Avington Pl
Gainesville, VA 20155
Phone: (571) 248-7600  (new phone number)
Cell: (865) 279-1090
Email:  Bill.Hardy@PowerMeasurements.com


On Tue, Mar 3, 2015 at
2:38 AM, Ming Cheng <mingtcheng@yahoo.com>
wrote:

Paul and Bill,

I will be back in the Asia by
end of
  March or earlier April. I will call Bill later this week
to see what is best
  time to meet or as we discussed earlier Bill can make a
weekend stop in
  Hangzhou to meet Paul in Hangzhou first.

Thanks and Best
  regards

Ming

--------------------------------------------
On
  Mon, 3/2/15, Paul-office <paul.qian@reallin.com>

  wrote:

Subject: Re:
Opportunity
To: "Ming Cheng"
<mingtcheng@yahoo.com>
Cc:
"Bill Hardy" <bill.hardy@powermeasurements.com>
Date:
Monday, March 2, 2015, 4:01 AM

Dear friends,

      I am at KL today,and
will
back to
 office 5th of March.


   I want meeting with
you,Bill!
       Ming, pls
arrange
meeting and your
 plan.

Best
regards

发自我的
iPad

>
 在
2015年3月2日, 14:31, Ming Cheng
<mingtcheng@yahoo.com>
写道:
>
>
 HI
Bill,
>
> Thanks for
following
up
 with our discussion. Due my travelling schedule
 and the Chinese New
 Year holiday, Paul and I have not
 following up with you on our
 discussion, but we did not
 forget about
this project. I will try to
 call you when next
 week while you are in
Cebu. I had to come out to
 SF to visit
 my parents and I will be
back to Knoxville Tuesday
 night.
>
>
> Thanks and happy new
year
>
>
 Ming
>
-----------------------------------------
>
 On Sun, 3/1/15, Bill Hardy <bill.hardy@powermeasurements.com>
wrote:
>
>
 Subject:
Opportunity
> To: "Paul Qian"
<Paul.Qian@reallin.com>,
"Ming
 Cheng" <MingTCheng@yahoo.com>
>
 Date: Sunday, March 1, 2015, 11:55 PM
>

> I'm
 sitting
here
> in
the Airport in Hong
 Kong
waiting for my plane to Cebu.
>
 Was
thinking about the joint venture we
discussed.
I
> haven't had any feedback for
several
 weeks so wanted
 to
> follow up and find
out if the interest was
 still
> there.
>
If we want to be able to do something
 I
 need one
> or
more contacts that are
 actively
 engaged so we can
> exchange
ideas and documents on a
 daily basis.
>
 Please let me know if you are still
 interested
> and able to
 proceed.
>
Regards,Bill
>
>
William
 H
> Hardy, PhDPower
Measurements,
> LLC6386
 Avington
PlGainesville, VA
> 20155Phone:
 (571)
248-7600  (new phone
>
 number)Cell:
(865) 279-1090Email:
 Bill.Hardy@PowerMeasurements.com

 >

# EXHIBIT 7

# 5 Series
# _PowerMaster®_

## True Three Phase Analyzing Reference Standard with Internal Three Phase Current Source



- *Protect Your Revenue*
- *Reduce Testing Time*
- *Built-In Error Detection*

- *Lightweight and Compact*
- *Easy to Use*
- *2 Year Warranty*

Powermetrix is pleased to introduce the most innovative field testing device in the electric utility industry. The PowerMaster® 5 Series is a top of the line field instrument with a true 3-phase analyzing reference standard with optional integrated current source. With an accuracy of ±0.04% in the field, the PowerMaster® 5 Series is more accurate than most lab standards, and 5 times more accurate than most meters. With the ability to measure all primary and secondary signals, the 5 Series can test all 3 phases for CT burden and ratio errors. It tests meters under customer load and/or generated load conditions. With many advanced features, the PowerMaster® 5 Series is revolutionizing field testing!

## www._POWERMETRIX_.com
### Creating Better Testing Solutions







# n and Value...A Perfect Combination!

*Actual PowerMaster Screens*

## Site Diagnostics

## CT Testing

Customer Load
and
Generated Load

## abase Driven

## Other Features

Demand Testing

Meter Site Manager Software

Automatic Calibration Verification

# Technical Specifications



## DIRECT INPUTS

| | |
|---|---|
| AC Current: | 3 Inputs, 0 to 20A<br>1 uA Resolution |
| AC Voltage: | 4 Inputs, 30 to 600V<br>1 uV Resolution |
| Aux. Power: | 1 Input, 100 to 530VAC |

## PROBE INPUTS

Two sets of three inputs
Resolution and range determined by probe

## MEASUREMENTS

| | |
|---|---|
| Energy: | Wh, VARh, VAh<br>± 0.04% Accuracy |
| Power: | Watt, VAR, VA<br>± 0.04% Accuracy |
| Power Factor: | -1.00 to 1.00 |
| Harmonics: | Up to 100th harmonic (user selectable) |

## CURRENT SOURCE

| | |
|---|---|
| Current Output: | 0.1A to 20A (5302) |
| Phase Adjustment: | 0 to 360 degrees |

## SYSTEM CONNECTIVITY

| | |
|---|---|
| Pulse Inputs: | 3 (meter pulse input, standard input, aux input) |
| Pulse Outputs: | 2 (standard output, sync output) |
| USB to PC Port: | 1 (connectivity to PC) |
| USB Ports: | 2 (peripheral devices and barcode reader) |
| RS232 Port: | 1 (legacy devices) |
| Audio Port: | 1 (microphone, headphones) |

## OTHER

| | |
|---|---|
| Display Resolution: | 640 x 480, full color transflective VGA |
| Display Size: | 8.4 inches |
| Operating Temperature: | -20° C to 50° C (-4° F to 122° F) |
| Storage Temperature: | -30° C to 60° C (-22° F to 140° F) |
| Humidity: | 0 to 95% non-condensing |
| Internal Battery: | 14V NiMH rechargeable |
| Dimensions: | 21 in x 17 in x 8.5 in |
| Weight: | Not including cables<br>5300 29.4lbs (13.3kg) 5302 35.6lbs (16.1kg) |
| Warranty: | 2 Years |

*All information subject to change.
*See product manual for detailed specifications.

# Model Number Selector

**5300**
3 Phase Reference Standard (0.04%)
Harmonic Analysis up to 100th
Wiring Verification
Customer Load Meter Testing
Demand Meter Testing
3 Phase Simultaneous CT Testing
Meter Site Manager Software

**5302**
+ 3 Phase 20Amp Current Source

# Contact Information

Martin T. Hiatt, Director of Sales and Marketing
martin.hiatt@powermetrix.com

Vernon White, Eastern Regional Manager
vernon.white@powermetrix.com

Scott Bucklew, Central Regional Manager
scott.bucklew@powermetrix.com

Steve Sennett, Western Regional Manager
steve.sennett@powermetrix.com

Ming T. Cheng, Director of Asian Operations
ming.cheng@powermetrix.com

**Customer Service**
Phone 865.218.5838
Toll Free 877.966.5851



**POWERMETRIX**

A Division of
Technology for Energy Corporation
10737 Lexington Drive
Knoxville, TN 37932-3294
Phone: 865.218.5837
Toll Free: 877.966.5850
Fax: 865.675.1241
www.powermetrix.com



# *POWERMASTER* 7 SERIES

*Analyzing Reference Standard*
*with Current and Voltage Sources*

*Powermetrix is pleased to introduce the most innovative field testing device in the electric utility industry. The PowerMaster® 7 Series is a top of the line field instrument with a true 3-phase analyzing reference standard and optional integrated current and voltage sources. With an accuracy of ±0.02% in the field, the 7 Series is more accurate than most lab standards, and 10 times more accurate than most meters. With the ability to measure all primary and secondary signals, the 7 Series can test all 3 phases for CT burden and ratio errors. It tests meters under customer load and/or generated load conditions. With many advanced features, the PowerMaster® 7 Series is revolutionizing field testing.*



## POWERMETRIX

### *RAISING THE STANDARD*

# POWERMASTER® 7 SERIES

*True 3 Phase Analyzing Reference Standard with Internal 3 Phase Current and Voltage Source*

## Direct Inputs

**AC Current:**
3 inputs, 0 to 20A or 0 to 50A (model dependent)
1 uA Resolution
**AC Voltage:**
4 inputs, 30 to 600V
1uV Resolution
**Aux. Power:** 1 input, 100 to 530VAC

## Probe Inputs

Two sets of three inputs
Resolution and range determined by probe

## Current Source

**Current Output:**
0.1A to 20A (7302, 7332)
0.1A to 50A (7305, 7335)
Phase Adjustment: 0 to 360 degrees

## Voltage Source

**Voltage Output:**
30V to 480V (7332, 7335)
30V to 600V (available upon request)
Phase Adjustment: 0 to 360 degrees

## System Connectivity

**Pulse Inputs:** 3 (meter pulse input, standard input, aux input)
**Pulse Outputs:** 2 (standard output, sync output)
**USB to PC Port:** 1 (connectivity to PC)
**USB Ports:** 4 (peripheral devices and barcode reader)
**Ethernet Port:** 1 (high speed connectivity including internet)
**RS232 Port:** 1 (legacy devices)
**SD Memory Port:** 1 (removable SD Memory support)
**Audio Port:** 1 (microphone, headphones)

## Warranty

5 years

*All information subject to change

## Measurements

**Energy:**
Wh, VARh, VAh
+/- 0.02% Accuracy
**Power:** Watt, VAR, VA
+/- 0.02% Accuracy
**Power Factor:** -1.00 to 1.00
**Harmonics:** Up to 100th harmonic (user selectable)

## Other

**Display Resolution:** 640 x 480,
full color transflective VGA
**Display Size:** 8.4 inches
**Operating Temperature:** -20°C to 50°C (-4°F to 122°F)
**Storage Temperature:** -30°C to 60°C (-22°F to 140°F)
**Humidity:** 0 to 95% non-condensing
**Internal Battery:** 14V NiMH rechargeable
**Dimensions:** 21 in x 17 in x 8.5 in
**Weight:** Not including cables
7300: 29.4lbs (13.3kg) 7302 35.6lbs (16.1kg)
7305: 38.4lbs (17.4kg) 7332 42.2lbs (19.1kg)
7335: 45.0lbs (20.4kg)

# MODELS

### 7300

3 Phase Reference Standard
±0.02% Traceable to NIST
3 Phase Vectors and Waveforms
Harmonic Analysis up to the 100th
Customer Load Meter Testing
Demand Meter Testing
3 Phase Simultaneous CT Testing
3 Phase Simultaneous PT Testing
CT Demagnetization
Transducer Testing
Data Trending
Meter Site Manager Software

### 7302

With Integrated 3 Phase
20A Current Source

### 7305

With Integrated 3 Phase
50A Current Source

### 7332

With Integrated 3 Phase
20A Current Source AND
3 Phase 480V Voltage Source

### 7335

With Integrated 3 Phase
50A Current Source AND
3 Phase 480V Voltage Source

# POWERMETRIX

**A Division of Technology for Energy Corporation** | **865.218.5837** | **www.powermetrix.com**
10737 Lexington Drive | Knoxville, TN USA 37932 | Toll Free: 877.966.5850 | Fax: 865.675.1241
Martin T. Hiatt, VP of Sales & Marketing | martin.hiatt@powermetrix.com